913 F.2d 1033
 62 Ed. Law Rep. 881
 P.C., Plaintiff-Appellee,
v.
Neil McLAUGHLIN, individually, Rod Copeland, individually
and in his capacity as Director of Mental Health, William A.
Dalton, individually and in his capacity as Vermont
Commissioner of Mental Health, David Burrus, individually
and in his capacity as Assistant Director of Mental Health,
Jordan Derderian, individually and in his capacity as
Protective Services Worker, Vermont Department of Mental
Health, Theresa Wood, individually and in her capacity as
Chief of Operations, Division of Mental Retardation Programs
Department of Mental Health, Michael Chamberlain,
individually and in his capacity as Sheriff of Windham
County, State of Vermont, Stephen Kaagan, individually and
in his capacity as Vermont Commissioner of Education, Defendants,
Neil McLaughlin, individually, Rod Copeland, individually
and in his capacity as Director of Mental Health, William A.
Dalton, individually and in his capacity as Vermont
Commissioner of Mental Health, and David Burrus,
individually and in his capacity as Assistant Director of
Mental Health, Jordan Derderian, individually and in his
capacity as Protective Services Worker, Vermont Department
of Mental Health, Theresa Wood, individually and in her
capacity as Chief of Operations, Division of Mental
Retardation Programs, Defendants-Appellants.
 No. 582, Docket 89-7565.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 12, 1990.
Decided Sept. 6, 1990.
 
 Joseph L. Winn, Asst. Atty. Gen., State of Vt., Waterbury, Vt. (Jeffrey L. Amestoy, Atty. Gen., Dena Monahan, Asst. Atty. Gen., State of Vt., Waterbury, Vt., of counsel), for defendants-appellants.
 John D. Shullenberger, Burlington, Vt. (Mickenberg, Dunn, Sirotkin and Dorsch, Burlington, Vt., Shirley Markland, Vermont Legal Aid, Inc., Rutland, Vt., of counsel), for plaintiff-appellee.
 Before VAN GRAAFEILAND, CARDAMONE and ALTIMARI, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 The instant appeal is taken by several employees of the Vermont Department of Mental Health (Department) from an order entered in the United States District Court for the District of Vermont (Billings, J.). In a suit instituted by appellee P.C. alleging that appellants had deprived him of certain constitutional and statutory rights, their motion for summary judgment based on the defense of qualified immunity was denied. P.C., a mildly retarded man now 23 years old, was abandoned when he was three and shuffled from foster home to foster home while a ward of the State of Vermont. At the age of 18 appellant Department became his guardian. Things did not change for the better. Over the years P.C. had acquired an assaultive behavior pattern that made suitable placements hard to find. Without viable alternatives appellants had P.C. placed in a school for the severely retarded, and while there he was sexually assaulted.
 
 
 2
 Underlying the litigation initiated on his behalf is P.C.'s contention that he was unjustly placed in difficult circumstances not of his own making. It is understandable how the district court judge viewing this unfortunate scenario believed that there were questions of fact mandating denial of appellants' motion for summary judgment. It is a truism that all are born into trouble, which is sometimes overcome but seldom extinguished. Although we recognize that P.C.'s life has been hard, we cannot say that his hardships are due to appellants' actions. Further, our task is not to try to untangle the complex human problem of which P.C. presently complains; rather we must examine whether the applicable laws allegedly violated were clearly established, and determine whether questions of fact exist respecting appellants' conduct.
 
 FACTS
 
 3
 In the lawsuit underlying this appeal P.C. alleged that various Vermont state officials failed to provide him with appropriate residential and educational services as required by law. Since the age of three P.C. has been in the custody of the State of Vermont and lived in at least nine foster homes and schools before turning 18. On December 11, 1985, several months after his eighteenth birthday, he was placed by provision of Vermont law under the guardianship of the Commissioner of the Department, then Neil McLaughlin. P.C. was at the time a resident student at the Green Meadows School in Wilmington, Vermont.
 
 
 4
 Jordan Derderian, assigned as P.C.'s protective services caseworker, met with him and reviewed his records. These included a comprehensive evaluation prepared in connection with the guardianship proceedings and an Individualized Education Program (individual educational program) outlining required special education services. Derderian concluded that a small family residence run by trained personnel, coupled with day school, would be more beneficial to P.C. than the Green Meadows School, the residents of which were more severely handicapped than P.C. and too low-functioning to be appropriate peers. In addition, P.C.'s history of "maladaptive" behavior, such as verbal assaultiveness and lack of cooperation, suggested a setting where P.C. would receive significant individual attention.
 
 
 5
 P.C. contends that his present behavior problems were caused, at least in part, by the failure on the part of the State of Vermont to provide him with adequate care and education and a stable, supportive living environment. Unfortunately, a vicious circle was established: P.C. acting assaultive out of frustration because his living environment was not suitable for his needs and that behavior making it difficult to find a permanent residential placement that would meet those needs.
 
 
 6
 In February 1986 Green Meadows stated that P.C. would have to leave on April 1 because of his anti-social behavior. He was moved to a short-term respite home in St. Albans, while Derderian searched for an appropriate living facility. During this time P.C. refused to participate in any educational program. The caseworker applied to six residential schools, none of which would accept P.C. At the end of April the temporary caretakers asked that he be removed because he was becoming too attached to them and because of behavior problems including belligerence and drinking incidents. On April 29 he was moved to a second temporary respite home while efforts continued to find appropriate long-term residential care. He refused tutoring during his time in this second temporary home.
 
 
 7
 On May 17 P.C. was moved to an unlicensed community care home in Bellows Falls where he received no schooling because during the summer the local school district provided summer school only in emergency cases involving regression of educational performance, and because P.C. stated that he preferred to work. In September 1986 he was enrolled in an occupations program at a local high school. Problems quickly arose in the residential placement due to P.C.'s aggressive behavior and the caretakers' unmet request for additional compensation for their services. After an incident in which P.C. threatened a member of the household with a screwdriver and then stayed away overnight, the caretakers notified Derderian on November 8, 1986 that they could not handle P.C. and that he would have to leave within two days, or by November 10.
 
 
 8
 Derderian then contacted Theresa Wood, Chief of the Operations Division of Mental Retardation Programs and coordinator of the respite care programs, who told him that no placements were immediately available. After discussing the situation with Dave Burrus, Assistant Director of Mental Retardation Programs, Derderian and Wood concluded that the only option then available was the Brandon Training School (Brandon), a state-owned residential school for severely retarded individuals. When Derderian told P.C. that he would not be returning to the foster home, P.C. refused to cooperate and local police officers were called to transport P.C. to Brandon pursuant to Vermont's "emergency admission procedure law." Vt.Stat.Ann. tit. 18, Sec. 8830 (1987). During the course of transportation P.C. was placed in handcuffs in accordance with standard police procedures.
 
 
 9
 On November 13, 1986 an administrative hearing was held to determine if the statutory requirements for short-term emergency admission to Brandon had been met. Id. Sec. 8830(a)(2). The hearing officer found that P.C. was not a person in need of commitment at Brandon because he did not pose a danger to himself and because Brandon could not provide appropriate care, treatment and habilitation for him. Based on these findings, the Superintendent of Brandon denied P.C. admission to the school. Nevertheless, because defendants did not have a residential placement available P.C. remained at Brandon. The Department appealed the Superintendant's decision, and also filed two petitions for involuntary admission in the Vermont District Court, one on December 5, 1986 and the second on January 13, 1987. Both petitions were dismissed on procedural motions filed by P.C. On December 27, 1986 P.C. filed a writ of habeas corpus in state court, which was granted on January 27, 1987. As a result of that ruling, no further attempts were made to admit P.C. to Brandon. But because other residential options still were unavailable--except furnishing P.C. a motel room or leaving him to fend for himself--P.C. continued to reside at the school as a "guest."
 
 
 10
 From November 1986 to August 1988--or for nearly two years--P.C. remained at Brandon. He received only sporadic educational services, largely because he resisted defendants' attempts to develop for him an individual educational program. For example, he was enrolled in an occupations program at a local school in March 1985 but was expelled after 40 days on account of his behavior.
 
 
 11
 In August 1987 this action was filed on his behalf seeking a declaratory judgment and injunction requiring the defendant state officials to place P.C. in an appropriate, professionally supervised community facility and to develop a long range treatment, residential and educational plan, as well as an award of compensatory damages against defendants in their individual capacities for violations of his constitutional and statutory rights. The district court issued a preliminary injunction by an opinion and order entered on January 28, 1988. After plaintiff filed a motion to hold defendants in contempt for failure to obey the injunction, P.C. was placed in a professional foster home and in a special education program in late August 1988, where he remains.
 
 
 12
 The complaint alleges violations of P.C.'s constitutional rights to due process of law (second cause of action) and protection from harm under the Fourteenth Amendment and under the Civil Rights Act, 42 U.S.C. Sec. 1983 (1982) (third and fourth causes of action) and violation of his federal statutory rights under the Education for All Handicapped Children Act of 1975, codified at 20 U.S.C. Sec. 1401 et seq. (1988), (first cause of action) and the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794 (1988) (fifth cause of action). Several present and former employees of the Department were named as defendants including appellants Neil McLaughlin and Ron Copeland, both former Commissioners of the Department, William Dalton, the current Director of Mental Health, Jordan Derderian, Dave Burrus, and Theresa Wood.
 
 
 13
 Appellants moved to dismiss the suit, insofar as it sought damages against them in their individual capacities, by asserting the qualified immunity defense from suit bestowed on them by law because of their status as public officials. After the district court denied the motion, this appeal followed.
 
 DISCUSSION
 I Qualified Immunity
 
 14
 In denying appellants' motion for summary judgment dismissing P.C.'s complaint, the district court found the assertion of the qualified immunity defense to be without merit. We shall discuss that defense in general and then in the context of appellee's statutory claims and finally with regard to his constitutional claims.
 
 
 15
 Qualified immunity is the doctrine that shields government officials performing discretionary functions from being held liable for civil damages arising from their actions which do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The doctrine affords protection to a government official only from suit in his individual capacity, that is, only insofar as the legal action attempts to fasten personal liability on the official for his or her conduct taken under color of state law. See generally Kentucky v. Graham, 473 U.S. 159, 165-68, 105 S.Ct. 3099, 3104-06, 87 L.Ed.2d 114 (1985) (comparing personal-capacity and official-capacity suits). In contrast, a suit brought against a public officer in his official capacity is treated as a suit against the government; damages are available only from the public fisc and the protection of qualified immunity is not applicable. Id.
 
 
 16
 The doctrine nicely balances the need to provide redress when an official abuses his or her public office against the costs of compelling government officials to shoulder the burden of defending themselves against suit. These costs include deterring individuals from accepting public employment, inhibiting officials in the discharge of their duties, diverting employees' energies from public duties and forcing them to bear the expense of litigation. Harlow, 457 U.S. at 814, 102 S.Ct. at 2736. The Supreme Court has expressly encouraged the use of summary judgment in cases involving qualified immunity in order to quickly extricate government officials from the burdens of defending against insubstantial suits. Id. at 815-16, 102 S.Ct. at 2736-37; Butz v. Economou, 438 U.S. 478, 507-08, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978).
 
 
 17
 Because the doctrine provides immunity from suit that will effectively be lost if a case is erroneously permitted to go to trial, a district court's decision denying a motion to dismiss on qualified immunity grounds is immediately appealable. Mitchell v. Forsyth, 472 U.S. 511, 526-27, 105 S.Ct. 2806, 2815-16, 86 L.Ed.2d 411 (1985). Review is limited to those cases that can be decided as a matter of law, not those that turn on disputed issues of fact. Id. at 530, 105 S.Ct. at 2817; see also Neu v. Corcoran, 869 F.2d 662, 664-65 (2d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989); Mahoney v. Hankin, 844 F.2d 64, 68 (2d Cir.1988). In the case at bar the district court concluded that defendants' qualified immunity defense involved factual questions that could not be resolved on summary judgment. We disagree. The validity of the defense--accepting the truth of P.C.'s factual allegations--may be decided as a matter of law. Therefore we may decide whether qualified immunity insulates appellants from suit. See, e.g., Neu, 869 F.2d at 665.
 
 
 18
 The threshold issue is whether the relevant law was clearly established at the time the alleged violation occurred. Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. To put it in other words, the rights that plaintiff asserts were violated must have been clearly established in a "particularized sense," so that a reasonable official would know that his actions violated plaintiff's rights. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir.1988).
 
 
 19
 Even when a plaintiff's federal rights are clearly defined, qualified or good faith immunity might still be available if it was "objectively reasonable for [the public official] to believe that his acts did not violate those rights." Robison v. Via, 821 F.2d 913, 921 (2d Cir.1987) (citing Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). Subjective inquiry into a government employee's motivations in acting or refusing to act has been rejected because it generally implicates questions of fact and is therefore incompatible with the expressed policy that summary judgment be readily available to protect government employees from suit. Harlow, 457 U.S. at 815-16, 102 S.Ct. at 2736-37; Anderson, 483 U.S. at 639-40 & n. 2, 107 S.Ct. at 3039 & n. 2.
 
 
 20
 Because this appeal arises from the denial of a motion for summary judgment we review the record de novo, taking as true the factual allegations of the nonmoving party, Fed.R.Civ.P. 56, and drawing all inferences from the underlying facts in appellee's favor. See Dube v. State Univ. of N.Y., 900 F.2d 587, 597 (2d Cir.1990). In sum, our inquiry is twofold: whether P.C.'s rights were clearly established at the time of defendants' actions and, if so, whether it was objectively reasonable for defendants to believe that their actions did not violate those rights.
 
 
 21
 The district court found that each of the rights allegedly violated was "clearly established" within the meaning of Anderson v. Creighton. It also concluded that there were "too many factual uncertainties to determine whether defendants' actions were objectively reasonable in light of the clearly established law." We are unable to agree with either of the district court's conclusions. Discussion begins with an analysis of the statutory claims set forth in the first and fifth causes of action.
 
 II Statutory Claims
 
 22
 A. Education For All Handicapped Children Act Claims
 
 
 23
 The Education for All Handicapped Children Act of 1975, codified at 20 U.S.C. Secs. 1401 et seq., (Education Act) provides handicapped children with a substantive right to a "free appropriate public education." 20 U.S.C. Sec. 1400(c); see generally Mrs. W. v. Tirozzi, 832 F.2d 748, 750-52 (2d Cir.1987) (Education Act structured as a funding statute but also creates substantive rights). It requires the local education agency--usually the local school district--to provide education in conformity with an individual educational program. The gist of plaintiff's Education Act claim is that his ability to succeed educationally is inexorably linked to his residential placement, and that the frequent changes of residence have led to inconsistent and sporadic schooling that limited his ability to receive an appropriate education. He also alleges violations of several procedural rights, including the right to notice and a hearing before being removed from school, 20 U.S.C. Secs. 1415(b)(1)(C), (b)(2), and the right to a comprehensive evaluation prior to any significant change in his individual educational program, 34 C.F.R. 300.534 (1989).
 
 
 24
 We agree with the district court's observation that the asserted Education Act claims are neither unusual nor unfamiliar. P.C. clearly has a right to a free appropriate public education, but in order to defeat a qualified immunity defense he must show that such right was "clearly established" in more than just a general sense; that is, it must be demonstrated that the particular actions taken by defendants were impermissible under law established at that time. See Anderson, 483 U.S. at 640, 107 S.Ct. at 3039; Eng, 858 F.2d at 895.
 
 
 25
 It is far from clear that the Education Act required any particular residential placement for P.C. The Education Act provides that an individual educational program shall be established for each handicapped child--including a statement of the specific educational services to be provided--but it does not include a residential component. 20 U.S.C. Secs. 1401(a)(19), 1414(a)(5). Additionally, even assuming there is a relationship between P.C.'s living situation and his lack of educational success, it certainly was not clearly established that appellants, as employees of the Department, rather than Vermont's State Department of Education or the local school district where P.C. was residing, were considered the local educational agency responsible for providing appropriate educational programming.
 
 
 26
 The procedural claims are also not clearly established. The hearing requirement set forth at 20 U.S.C. Sec. 1415 is triggered by a change in educational placement initiated by the local educational agency. P.C.'s change in residence was not a change in educational placement initiated by a local educational agency. Moreover, the need for notice and hearing is not occasioned by every change in the educational program. See Concerned Parents and Citizens for the Continuing Education at Malcolm X v. New York City Bd. of Educ., 629 F.2d 751, 753-55 (2d Cir.1980), cert. denied, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981) (holding that procedural protections of Sec. 1415 not triggered by transfer of special education classes at one regular school to another in the same district).
 
 
 27
 Of course, when rights are not clearly established, appellants are entitled to qualified immunity as a matter of law. See Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738. Because we examine appellants' conduct in view of the law that was established when the complained of actions were taken, a subsequent finding that the law was violated would not affect immunity analysis. See Mitchell, 472 U.S. at 534-35, 105 S.Ct. at 2819-20. It is unnecessary to decide expressly whether the Education Act was violated because we cannot say that reasonable public officials would understand that their actions violated P.C.'s rights to a free appropriate public education.
 
 B. Rehabilitation Act Claims
 
 28
 Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794, provides that "[n]o otherwise qualified individual with handicaps ... shall, solely by reason of her or his handicap, ... be denied the benefits of ... any program or activity receiving Federal financial assistance...." P.C. alleges that he was denied educational, residential and other services that have been made available to other handicapped individuals, solely on the basis of his handicap. He further asserts that factual disputes exist regarding whether his particular handicapping conditions--ones that caused his behavior to be erratic--were the basis for defendants' failure to provide him with these services. The district court agreed.
 
 
 29
 The "clearly established law" concerning Sec. 504 indicates that its central purpose is to assure that handicapped individuals receive " 'evenhanded treatment' " in relation to the nonhandicapped. Traynor v. Turnage, 485 U.S. 535, 548, 108 S.Ct. 1372, 1382, 99 L.Ed.2d 618 (1988) (quoting Alexander v. Choate, 469 U.S. 287, 304, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985)). The Act does not require all handicapped persons to be provided with identical benefits. Traynor, 485 U.S. at 548-49, 108 S.Ct. at 1381-82. Rather, it seeks to ensure that handicapped individuals have an opportunity to participate in and benefit from programs receiving federal assistance. Alexander, 469 U.S. at 304, 105 S.Ct. at 721.
 
 
 30
 P.C. does not claim that he was refused participation in any particular program. He contends, in essence, he was denied meaningful access to the benefits provided to other handicapped individuals because the services provided did not adequately meet his needs. Without addressing the adequacy of the services, we note that the law governing Sec. 504 did not clearly establish an obligation to meet P.C.'s particular needs vis-a-vis the needs of other handicapped individuals, but mandated only that services provided nonhandicapped individuals not be denied P.C. because he is handicapped.
 
 
 31
 A more fundamental deficiency in P.C.'s position is the absence in the record of any evidence of discrimination. Section 504 is governed by the rules governing the anti-discrimination law, and under these rules plaintiff is obliged to establish a prima facie case. See Fleming v. New York Univ., 865 F.2d 478, 482 (2d Cir.1989). There is a complete absence of any factual support in the record to substantiate the bare allegation that a discriminatory animus prompted the treatment P.C. received. Defendants came forward with uncontroverted evidence demonstrating that the many changes in P.C.'s residence and schools were brought about at the request of the various caregivers. No proof has been offered to suggest that more suitable accommodations were available and not offered to him. Although the qualified immunity defense is determined on the objective grounds of whether a "reasonable" public official would understand he is violating clearly established legal standards, inquiry into subjective elements may be proper when the underlying cause of action requires proof of intent. See Musso v. Hourigan, 836 F.2d 736, 743 (2d Cir.1988). In this case absent evidence of discriminatory animus, there is no basis to find defendants' conduct unreasonable in relation to plaintiff's clearly established rights under Sec. 504.
 
 III Constitutional Claims
 A. Due Process
 
 32
 We turn now to the constitutional claims. In his second cause of action plaintiff alleges that he was deprived of liberty and property without due process of law in violation of the Fourteenth Amendment to the United States Constitution and that the manner in which plaintiff was transported to Brandon constituted an unlawful seizure in violation of his Fourth Amendment rights, both rights protected by 42 U.S.C. Sec. 1983. Since, as noted, the viability of a qualified immunity defense turns on a particularized inquiry, see Anderson, 483 U.S. at 640, 107 S.Ct. at 3039; Eng, 858 F.2d at 895, we must examine the state of the established law and the reasonableness of defendants' actions with respect to each of P.C.'s allegations. Although the constitutional claims are somewhat intertwined with each other and with the statutory Education Act claim, we discuss them separately.
 
 1. Substantive Due Process
 
 33
 P.C.'s substantive due process causes of action allege that his placement and continued confinement at Brandon violated his liberty interests and deprived him of a property right to receive services to which he was entitled in contravention of the Fourteenth Amendment. The liberty interests of retarded persons under the Fourteenth Amendment were analyzed in two pertinent cases, Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) and Society for Good Will to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239 (2d Cir.1984). These cases set the rule that retarded persons in the custody of state officials have constitutionally protected rights to adequate food, shelter, clothing and medical care, Youngberg, 457 U.S. at 315, 102 S.Ct. at 2457; Society for Good Will, 737 F.2d at 1243-45, to safe living conditions, Youngberg, 457 U.S. at 315, 102 S.Ct. at 2457; Society for Good Will, 737 F.2d at 1245-46, and to freedom from undue bodily restraint (i.e., shackles), Youngberg, 457 U.S. at 316, 102 S.Ct. at 2458; Society for Good Will, 737 F.2d at 1247.
 
 
 34
 A retarded individual also has a due process right to "minimally adequate training," Youngberg, 457 U.S. at 322, 102 S.Ct. at 2461, though this right is limited to preserving basic skills such as "the ability to dress [oneself] and care for [one's] personal hygiene." Id. at 327, 102 S.Ct. at 2464 (Blackmun, J., concurring); Society for Good Will, 737 F.2d at 1250. The Constitution does not guarantee a mentally retarded person the right to live in the community of his choice or in the least restrictive environment. Society for Good Will, 737 F.2d at 1249. In light of these established standards, and because there is no allegation that P.C.'s basic self-care skills deteriorated, P.C. did not have a clearly established liberty interest in being placed in a less restrictive setting than the Brandon School.
 
 
 35
 In examining the reasonableness of appellants' actions in light of established law we note that the Supreme Court has emphasized the deference due to judgment exercised by qualified professionals.
 
 
 36
 [T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.
 
 
 37
 Youngberg, 457 U.S. at 323, 102 S.Ct. at 2462. P.C. contends that he was not sent to Brandon based on an exercise of professional judgment because--as appellants admit--his admission did not hinge on a decision that his level of functioning necessitated it. But P.C.'s level of functioning was not the only factor that led to the decision to place him at Brandon. That decision was prompted by the total lack of any viable alternative, and compelled by the necessity to provide him with food, shelter, clothing and medical care. The requirement that professional judgment be exercised is not an invitation to a court reviewing it to ascertain whether in fact the best course of action was taken. See id.; Society for Good Will, 737 F.2d at 1248; see also Society for Good Will to Retarded Children, Inc. v. Cuomo, 902 F.2d 1085, 1089-90 (2d Cir.1990). Because P.C.'s placement decision was made by qualified professionals in light of the circumstances then facing them, their judgment is entitled to deference in the courts reviewing that decision.
 
 
 38
 Further, the Supreme Court has held that good-faith immunity will bar liability in an action for damages against a government professional in his or her personal capacity if the professional was unable to meet normal professional standards as a result of budgetary constraints. See Youngberg, 457 U.S. at 323, 102 S.Ct. at 2462. That holding governs here where defendants were unable to place plaintiff in a more suitable housing arrangement because of a lack of alternatives. Plaintiff concedes that defendants made efforts to secure other placements for him. Plainly, defendants made considerable attempts to see that P.C. received adequate care and services. Any failure to meet professional standards in P.C.'s case was due to factors beyond appellants' control. Given the circumstances that brought P.C. to Brandon, and that substantive constitutional rights did not encompass either the right to be placed in the least restrictive environment or to live in the community, it was objectively reasonable for defendants to believe that their action in placing P.C. at Brandon did not violate any of his clearly established substantive due process rights.
 
 2. Procedural Due Process
 
 39
 Claiming that his procedural due process rights were also violated, P.C. asserts an interference with his procedural rights under the Education Act caused by repeated changes in his residence without notice, improper evaluation of his individual educational program, improper integration between educational and residential services, failure to comply with the statutory requirements for admission to Brandon, and unlawful custody and restraint in his transport to Brandon.
 
 
 40
 We earlier determined that it was not clear whether the procedural safeguards of the Education Act applied to the decision to house P.C. at Brandon because it was not an "educational placement," and it similarly was not clear under established law whether the Department was the local educational agency responsible for ensuring that the Education Act procedures were complied with. The last two contentions relating to Brandon are likewise insubstantial.
 
 
 41
 With respect to the transportation to Brandon, defendants assert that they relied on the state procedures for emergency admission, Vt.Stat.Ann. tit. 18, Sec. 8830(c), in asking the sheriff's department to assist in transporting P.C. That statute authorizes "any mental retardation professional or law enforcement officer to take [P.C.] into temporary custody and to transport him to [Brandon]" when an application for emergency admission has been completed. Appellant Derderian was aware of P.C.'s history of running away and his aggressive and threatening behavior. The record indicates that P.C. had become particularly hostile to Derderian and refused to accompany him on the day in question. In light of these facts and the authority provided by state law, appellants' decision to use a police escort was not unreasonable. While the use of handcuffs is regrettable, it was not done at appellants' request; they merely acquiesced after being told it was police policy. We see no basis therefore for P.C.'s claim that defendants made an unlawful seizure under clearly established Fourth Amendment law.
 
 
 42
 We note that P.C. does not claim that the statute authorizing emergency admission to Brandon, including the provision for transportation, is unconstitutional on its face, but that the proper admission procedure was not followed. The record reveals that those procedures were complied with to the best of defendants' abilities and in accordance with a reasonable understanding of what the law required. An affidavit was completed pursuant to the relevant state law, Vt.Stat.Ann. tit. 18, Sec. 8830(a)(1). After the emergency admission was denied two subsequent petitions for involuntary admission were filed, both of which were dismissed at P.C.'s request. Defendants finally ceased their attempts to admit P.C. pursuant to a state court order granting habeas relief and P.C. was thereafter considered a "guest." It may be true that as a practical matter he had no choice but to remain at Brandon, but that circumstance was not a result of any failure on defendants' part to follow procedure. Consequently, no clearly established procedural due process right of appellee's was violated.
 
 B. Right to Protection From Harm
 
 43
 The third and fourth causes of action allege that defendants, as P.C.'s legal guardian or as agents and employees of his legal guardian, failed in their duty to protect him from physical and emotional harm in violation of his substantive right to due process under the Fourteenth Amendment and 42 U.S.C. Sec. 1983 and in violation of affirmative duties created under Vermont state law.
 
 
 44
 The law makes clear that "[w]hen individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the non-feasance of which may violate the constitution." Doe v. New York City Dep't of Social Servs., 649 F.2d 134, 141 (2d Cir.1981). Officials may be liable under 42 U.S.C. Sec. 1983 only if the omissions were a substantial factor leading to the denial of a constitutionally protected liberty or property interest and the officials displayed a mental state of deliberate indifference with respect to those rights. Id.
 
 
 45
 P.C. asserts that defendants were indifferent to his claimed liberty interest in receiving services in the community, living in the least restrictive environment, and not being taken into physical custody or held in confinement at Brandon. He also alleges indifference to his property interest in a free appropriate public education. The district court found that the deliberate indifference claims rested "soundly" on Doe and Youngberg. As previously stated, it was not unreasonable for defendants to believe that their actions did not violate plaintiff's rights in these areas because the liberty interests and property rights were not clearly established.
 
 
 46
 Further, liability under a claim of the right to be free from harm requires a more onerous showing of deliberate indifference. Qualified immunity is available if defendants reasonably believed their actions did not violate the law; that is, their actions did not amount to deliberate indifference with respect to clearly established rights that they knew P.C. possessed. Derderian's actions were not those of an indifferent professional. He made periodic checks with fellow protective services workers, with other employees of the Department and other community mental health agencies regarding alternative residences for P.C., and ran newspaper advertisements soliciting family care placements. Without judging the adequacy of these efforts--though it is difficult to see what more could be expected--we hold that it was objectively reasonable for appellants to believe that they were not deliberately indifferent to appellee's needs.
 
 
 47
 P.C. also alleges that defendants were obligated to protect and supervise him in the least restrictive environment pursuant to Vermont law, Vt.Stat.Ann. tit. 33, Sec. 3610(c) (1981). Obligations imposed by Vermont law are not relevant because liability for failure to protect from harm under Sec. 1983 must be based on a violation of federal constitutional or statutory law, not state law. See Davis v. Scherer, 468 U.S. 183, 193-94, 104 S.Ct. 3012, 3018-19, 82 L.Ed.2d 139 (1984); Robison, 821 F.2d at 922-23.
 
 
 48
 The fourth cause of action is predicated on the harm P.C. suffered when he was the victim of sexual abuse by an employee of Brandon. Although he concedes that he cannot demonstrate that appellants had reason to know that the staff person in question presented a risk of harm, he contends that appellants' failure to remove him from Brandon and provide counseling constitutes a failure to protect him from that risk.
 
 
 49
 Again, there simply are no facts on this record showing deliberate indifference. Caseworker Derderian promptly notified the state police and the adult abuse division of Social and Rehabilitative Services of the assault. An investigation of the incident was conducted by the state police. Although Derderian felt counseling was appropriate, P.C. refused it. Moreover, P.C. had no clearly established constitutional right to be provided with counseling services, having rejecting them when offered. Hence, no deliberate indifference to appellee's clearly established constitutional rights has been demonstrated, and his Sec. 1983 claim must therefore fall upon appellants' assertion of qualified immunity.
 
 CONCLUSION
 
 50
 Because appellants' actions did not violate clearly established statutory or constitutional rights and it was objectively reasonable for defendants to believe they did not violate P.C.'s rights, they are immune from suit in their personal capacities. Accordingly, the order of the district court denying their motion for summary judgment is reversed and the case is remanded to the district court with directions that it grant appellants' motion granting them summary judgment dismissing appellee's suit against them insofar as it sought compensatory damages against them personally.
 
 
 51
 Reversed and remanded.