LINCOLN CERCPAC, Stacey Ellis, in her individual capacity and as general guardian of infant Abraham Ellis; Abraham Ellis, an infant; Margarita Agosta in her individual capacity and as general guardian of infant Jesus Cortes, Jr.; Jesus Cortes, Jr. an infant; Elsa Lopez, in her individual capacity and as general guardian of infant Victor Galarza, Jr.; Victor Galarza, Jr., an infant; Ercilia Santos, in her individual capacity and as general guardian of infant Anthony Perez; Anthony Perez, an infant, Plaintiffs,

v.

**HEALTH AND HOSPITALS CORPORATION, Defendant.**

No. 95 Civ. 7154 (CBM).

United States District Court, S.D. New York.

March 21, 1996.

Kipp Elliot Watson, New York City, for plaintiffs.

City of New York Law Department by Todd Bromberg, James Girillo, New York City, for defendant.

## OPINION

MOTLEY, District Judge.

### I. Introduction

This action is brought under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. sec. 12101, *et seq.*, and section 504 of the Federal Rehabilitation Act of 1973 (the "Rehab Act"), 29 U.S.C. sec. 794. Plaintiffs, who seek class certification, claim to represent approximately 3500 developmentally disabled children and parents in the South Bronx and North Manhattan areas who formerly received services from the Children's Evaluation and Rehabilitation Clinic. This clinic was operated for twenty years by Lincoln Medical and Mental Health Center in the Bronx and was closed on August 31, 1995. Plaintiffs now move for a preliminary injunction to compel its reopening by defendant Health and Hospitals Corporation.[1] For the reasons described below, plaintiffs' motion is denied.[2]

### II. Background Facts

In order to serve the exceptional needs of children with developmental disabilities, Lincoln Medical and Mental Health Center ("Lincoln") developed a specialized clinic called the Children's Evaluation and Rehabilitation Clinic ("CERC"). CERC provided physical rehabilitative services to approximately 10% of its clients; however, its main role was to evaluate and diagnose their disabilities. CERC was not its clients source of general, or primary, health care, but rather offered them supplemental services. Thus part of CERC's role was to refer clients to primary health care providers when appropriate. Although there is dispute over the size of CERC's client base, from July 1994 to June 1995, CERC actively monitored about 1,000 patients of the alleged total 3,500 under its care. Tr. 254–55; 509.[3]

In the spring of 1995, the Health and Hospitals Corporation ("HHC") notified Lincoln that it faced a 25% cut in its 1996 operating budget due to the city, state, and federal governments' retrenchment of health care. In order to accommodate these imminent cuts, Lincoln's executive director, Roberto Rodriguez, in consultation with Lincoln's Chief Financial Officer and Senior Cabinet, decided to close three programs including CERC, eliminate 250 Lincoln staff positions, and cut Lincoln's supply and equipment budget by $2 million. CERC was selected for termination because it was expensive to maintain and had been operating at a deficit of approximately $700,000 a year. Tr. 255–56; 296; 460–63.

It was further decided that CERC's diagnostic and evaluative services would be relocated to the Morrisania Center for Child Development ("Morrisania"), a diagnostic center located about one mile, or twenty city blocks, from CERC in the Bronx. Since Morrisania did not have rehabilitation facilities for the 10% of CERC's former clients in need of them, HHC planned to continue to provide rehabilitative services at Lincoln. Eventually, Morrisania would provide all services on its premises. Morrisania was considered the optimal transfer site for several

1. The Health and Hospitals Corporation is a public entity that manages the administration of New York City's municipal hospitals.

2. On September 12, 1995, defendant filed a motion to dismiss the complaint. At the request of plaintiffs' counsel, defendant's motion to dismiss was deferred until after a decision was rendered on the instant motion for a preliminary injunction.

3. "Tr." refers to the transcript of the hearing on plaintiffs' motion for a preliminary injunction, held before this court on September 14, 18, 19, 20 and 21 of 1995.

reasons: (1) it is near Lincoln; (2) it has a twenty-year professional relationship with Lincoln; (3) it is equipped to provide evaluative services to CERC's clients; (4) it offers bilingual health care workers to assist Spanish speaking patients; and (5) it receives greater reimbursement from Medicaid than CERC for providing the same services. Tr. 517, 564–65; Declaration of Dr. Coll Ruiz, dated November 3, 1995.

The financial savings involved in transferring CERC's services to Morrisania was integral to the decision to relocate. HHC institutions like Morrisania and Lincoln can receive medicaid reimbursement under two alternative provisions: Article 16 of the Mental Hygiene Law and Article 28 of the Administrative Code. HHC obtains reimbursement under Article 28 since it allows for greater flexibility.[4] Under this provision, Morrisania receives $150.20 reimbursement per visit and Lincoln receives $92.47. Thus HHC saves a significant sum by providing services to the developmentally disabled at Morrisania rather than at Lincoln. Morrisania also had the capacity to provide the services formerly offered by CERC to CERC's clients. Morrisania is one of HHC's largest diagnostic and treatment centers and had been handling approximately 5,000 visits a year from developmentally disabled child patients before CERC was closed. Tr. 464; 505–21.

HHC then notified the parents by letter of the transition and sent them information packets. Parents were requested to execute consent forms releasing their children's medical records to Morrisania. Efforts were also made to replicate CERC's staffing at Morrisania.[5] In the third week of June, Lincoln notified CERC's clients that the clinic would be permanently closed on August 31, 1995, and clients referred elsewhere.[6] Tr. 264–65; 308–14; 514.

On August 29, 1995, plaintiffs moved for an *ex parte* temporary restraining order to enjoin defendant from closing CERC two days later, as scheduled. Judge Kaplan, in Part 1, denied this application since plaintiffs had failed to provide sufficient reason why defendant should not be notified. Plaintiffs then filed a complaint on August 30, 1995 requesting: (1) class certification; (2) a temporary restraining order to prevent CERC's closing; (3) a preliminary injunction to prevent CERC's closing; (4) a permanent injunction to enjoin defendant from discriminating against the disabled and from failing to provide an effective grievance procedure or properly evaluate its policies; and (5) a declaratory judgment that defendant had violated the ADA and section 504 by failing to provide equal access to its health care services.

A hearing on the temporary restraining order was held before Judge Kaplan on August 31, 1995, and on the same day plaintiffs' application was denied. Judge Kaplan found that:

> The conflicting evidence fails to persuade the Court that plaintiffs will suffer irreparable injury as a result of the transfer of the functions previously performed by Lincoln CERC to Morrisania Hospital. There is no evidence that the decision to close Lincoln CERC was made *because* plaintiffs' children are disabled and no persuasive evidence of disparate impact of a character likely to result in plaintiffs prevailing. *See Alexander v. Choate*, 469 U.S. 287 [105 S.Ct. 712, 83 L.Ed.2d 661] (1985).

*Lincoln Cercpac, et al. v. Health and Hospitals Corp.*, No. 95–7154 (Order filed August 31, 1995) (Kaplan, J.) (emphasis in original). On August 31, 1995, defendant closed CERC

---

**4.** The reimbursement rate under Article 16 of the Mental Hygiene Law is the same for everyone; however, it varies according to a facilities' institutional cost report under Article 28.

**5.** As of November 6, 1995, Morrisania had hired eleven former CERC employees, including the former chief administrator of CERC, and had received 465 sets of CERC patients' medical records. *See* Declaration of Dr. Coll Ruiz, dated November 3, 1995.

**6.** It was in fact the medical director of CERC who failed to refer CERC's clients to Lincoln for continued rehabilitative treatment, Tr. 372, and failed to advise them that Morrisania had been specifically designated as the transfer site for CERC's services. Tr. 270–72; 323–24. This contributed to the confusion surrounding the transfer process.

as planned, and only a skeleton staff remained behind to facilitate the transfer of services to Morrisania.

On September 14, 18, 19, 20 and 21 of 1995, this court held a hearing on plaintiffs' motion for a preliminary injunction and witnesses for both sides testified.[7]

### III. Discussion

#### A. Class Certification

■ As a preliminary matter, plaintiffs have moved to be certified to represent a class of "approximately 3500 children with developmental disabilities, or at risk of becoming developmentally disabled, served by CERC," pursuant to Fed.R.Civ.P. 23.[8] Complaint at p. 4. Since plaintiffs seek injunctive and declaratory relief against a government agency, HHC, plaintiffs' motion is denied on the ground that it is superfluous. *See Berger v. Heckler*, 771 F.2d 1556, 1566–67 (2d Cir. 1985) (class certification unnecessary in action for injunctive relief against Department of Health and Human Services); *Forts v. Ward*, 621 F.2d 1210, 1217–18 (2d Cir.1980) (class certification unnecessary in action for injunctive and declaratory relief against correctional facility); *Galvan v. Levine*, 490 F.2d 1255, 1261–62 (2d Cir.1973) (class certification unnecessary in action for declaratory and injunctive relief against New York Industrial Commissioner), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974).

If plaintiffs are granted their relief, it will affect all former and future CERC patients irrespective of whether they are included in a class action. In analogous cases where the government is a party, the Second Circuit has repeatedly denied certification. *See id.* For instance, in *Galvan v. Levine* two plaintiffs challenged certain New York State policies concerning unemployment insurance as discriminatory. The Second Circuit, in affirming the district court's denial of plaintiffs' motion for class certification, stated: "... an action seeking declaratory and injunctive relief against state officials on the ground of unconstitutionality of a statute or administrative practice is the archetype of one where class action certification designation is largely a formality, at least for the plaintiffs.... what is important ... is that the *judgment* run to the benefit not only of the named plaintiffs but of all others similarly situated." *Galvan*, 490 F.2d at 1261 (emphasis in original).

By the same reasoning, plaintiffs need not be certified to ensure that "all others similarly situated" receive the sought after relief, *i.e.*, a preliminary injunction to compel CERC's reopening, a permanent injunction to enjoin HHC from discriminating against the disabled and from failing to provide an effective grievance procedure, and a declaratory judgment that HHC has violated the ADA and Rehab Act by failing to provide equal access to health care services. The judgment, if in plaintiffs' favor, will benefit all members of the proposed class whether plaintiffs are granted certification or not.

In short, certification is unnecessary since it will not further the implementation of this court's judgment. *Berger*, 771 F.2d at 1566. As Judge Weinfeld explained in denying Rule 23 certification: "The defendants are public officials charged with compliance with and

---

**7.** Plaintiffs called six witnesses: Stacey Stan Ellis, a named plaintiff; Margarita Agosta, a named plaintiff; Luis Rodriguez, Senior Associate Dean of New York Medical College; Daniel S. Friedman, Associate Director and Administrator of Rose F. Kennedy Children's Evaluation and Rehabilitation Center; Lilia Evangelista, former Medical Director of CERC; and Elias S. Gootzeit, Executive Direct Elect of Applied Human Dynamics.

Defendant called five witnesses: Terese Rotondo, Associate Executive Director for the Department of Psychiatry and Mental Health at Lincoln; Mario Rendon, Director of Psychiatry at Lincoln; Erica Jeffries, Director of Budget and Reimbursement at Morrisania; Peter Wolf, Chief Financial Officer at Lincoln; and Hector Coll Ruiz, Director of the Department of Mental Health at Morrisania.

**8.** Fed.R.Civ.P. 23(a) sets forth the prerequisites to a class action as follows: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

enforcement of federal as well as state laws. The court assumes these public officials, mindful of their responsibilities, will apply the determination here made equally to all persons similarly situated." *Feld v. Berger,* 424 F.Supp. 1356, 1363 (S.D.N.Y.1976); *see also, Vulcan Society v. Civil Service Comm'n,* 490 F.2d 387, 399–400 (2d Cir.1973). We have the same confidence in defendant's evenhanded compliance with this court's decision, whatever it may be, and accordingly deny plaintiffs' motion for class certification.

## B. Standard For Preliminary Injunction

■ Plaintiffs are seeking preliminary injunctive relief. Usually, a party seeking to obtain a preliminary injunction must establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either "a likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of the hardships tipping decidedly" in favor of the movant. *Jolly v. Coughlin, et al.,* 76 F.3d 468, 473 (2d Cir. 1996); *Waldman Publishing Corp. v. Landoll, Inc.,* 43 F.3d 775, 779–80 (2d Cir.1994); *Coca–Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 314–15 (2d Cir.1982).

■ A heightened standard applies when the injunction sought (1) will alter, rather than maintain, the status quo—that is, a "mandatory" rather than "prohibitory" injunction; or (2) will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits. *Jolly,* 76 F.3d 468, 473; citing *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995). In such cases, the movant must make a "clear" or "substantial" showing of a likelihood of success, *id.,* and a strong showing of irreparable harm. *Doe v.*

*New York University,* 666 F.2d 761, 773 (2d Cir.1981).

■ Because plaintiffs in the instant case seek to compel HHC to reopen a clinic that was closed on August 31, 1995, they seek mandatory rather than prohibitory relief. A mandatory injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty,* 60 F.3d at 34. We recognize that "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics," *id.,* yet we do not find the desired injunction hard to identify. When plaintiffs first moved for a temporary restraining order, CERC was open and plaintiffs were attempting to prevent its closing. Once this application was denied by Judge Kaplan on August 31, 1995, however, CERC was immediately closed and has remained closed. Since then the transfer of services to Morrisania and Lincoln has been underway.

The relief sought here would accordingly alter the status quo, causing considerable headaches for Morrisania, Lincoln, HHC, and even, perhaps, some of CERC's former clients who have now changed facilities. Defendant would need to rehire staff, reopen closed facilities, return clients' medical files to CERC from Lincoln and Morrisania and notify the parents and children affected. Moreover, defendant would need to devise a way to accomplish this within the budgetary constraints set by the government.[9] Under such circumstances, the status quo should not be lightly overturned. *See, e.g., Jolly,* 76 F.3d 468, 474; *Tom Doherty,* 60 F.3d at 33–34. Plaintiffs are accordingly required to meet the heightened standard in order to obtain the preliminary injunctive relief they seek.[10]

9. Plaintiffs spent considerable time at the hearing, and in their brief, proposing alternative systems of billing for Lincoln. Whether or not HHC can devise a more ingenious and profitable billing scheme for Lincoln, however, is not the court's concern. As defendant notes, it is not the province of the judiciary to review the government's management of its own budget. *See, e.g., Ferguson v. Skrupa,* 372 U.S. 726, 729, 83 S.Ct. 1028, 1030, 10 L.Ed.2d 93 (1962) ("Legislative bodies have broad scope to experiment with eco-

nomic problems, and this Court does not sit to 'subject the State to intolerable supervision....'") (citation omitted). HHC has substantial experience allocating resources amongst New York's hospitals; this court does not. We accordingly decline to review HHC's billing practices.

10. Plaintiffs are also required to meet the heightened standard for preliminary injunctive relief

## C. Irreparable Harm

█ A showing of probable irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990) (citations omitted). Plaintiffs must demonstrate that such injury is "imminent, not remote or speculative," *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989), and that the alleged injury cannot be fully remedied by monetary damages. *See id.; Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 917–18 (2d Cir.1986). The law in this Circuit requires a strong showing of irreparable injury where mandatory injunctive relief is sought, *Doe*, 666 F.2d at 773; *Pazer v. N.Y. State Board of Law Examiners*, 849 F.Supp. 284, 287 (S.D.N.Y.1994), and a sufficient showing in any case. *Reuters*, 903 F.2d at 907.

█ Defendant argues that plaintiffs have failed to demonstrate that they will suffer irreparable harm if the instant motion is not granted. We agree. The record supports defendant's contention that it is not closing CERC so much as effecting the transfer of its services to Morrisania. Morrisania, in turn, has represented its intentions to assume CERC's responsibilities in full; *i.e.* to take over CERC's clients, to provide them with diagnostic and evaluative services and, eventually, to offer those clients in need rehabilitative services.

Plaintiffs have not shown how the transfer of services to Morrisania and Lincoln, in itself, will irreparably harm them. It is evident that plaintiffs are dubious of Morrisania's capacity and HHC's good faith, however, the court is not. Morrisania has a commendable record and years of experience providing health care services to the disabled. Moreover, HHC and Morrisania have made considerable efforts to smooth the transition, such as hiring CERC's former employees and offering ambulette service to the children who need it. Their actions demonstrate commitment to CERC's former clients, not a desire to abandon them. We also find no sign whatsoever of discriminatory intent toward the disabled clients of CERC. Given the layoffs at Lincoln and the termination of two other programs unrelated to the disabled, it seems evident that the budget cuts in health care cause inconvenience across the board, and not merely to plaintiffs. Thus plaintiffs' prediction, that Morrisania's performance for CERC's former clients will be ineffectual, is not shared by the court. In any event, such conjecture affords no basis for injunctive relief.

Plaintiffs also argue that the change in location, itself, is irreparable harm. Although plaintiffs have made much of the twenty block distance between Morrisania and Lincoln, a one mile difference in travel simply does not rise to the level of harm necessary to sustain a preliminary injunction, particularly a mandatory one.[11] *See id.* This is especially so in light of the ambulette service that Morrisania is willing to provide to any of CERC's former clients who want it.

█ Finally, plaintiffs suggest that the mere allegation of a civil rights violation is sufficient, on its own, to establish irreparable injury. It is true that there is a presumption of irreparable injury that flows from a violation of constitutional rights and the mere allegation of such a violation will trigger a finding of irreparable harm. *Jolly*, 76 F.3d 468, 481; citing *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992); and *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984). However, this rule is limited to constitutional rights; that is, that the *possibility* alone of a deprivation of rights is sufficient to constitute irreparable harm due to the fundamental na-

because the instant injunction will provide them with substantially "all relief that is sought." *See Tom Doherty*, 60 F.3d at 34–35. In other words, the "effect of the order, once complied with, cannot be undone," rendering a trial on the merits largely meaningless from defendant's perspective. *Id.* It would be difficult or impossible to offer HHC any meaningful remedy once it had been directed to recreate CERC pending trial, and on this basis as well, plaintiffs should have to meet the higher standard of substantial or clear showing of likelihood of success. *Id.* at 35.

11. Plaintiffs have not even clarified how many of CERC's alleged 3500 patients are farther from Morrisania than they are from Lincoln or by what distance.

ture of the right involved. *See Jolly,* 76 F.3d 468, 481 (eighth amendment); *Covino,* 967 F.2d at 77 (fourth amendment); *Mitchell,* 748 F.2d at 806 (eighth amendment); *Ambrose v. Malcolm,* 414 F.Supp. 485, 493 (S.D.N.Y.1976) (eighth amendment); and Wright & Miller, *Federal Practice and Procedure,* sec. 2948 at 440 ("When an alleged deprivation of a *constitutional right* is involved, most courts hold that no further showing of irreparable injury is necessary") (emphasis added).

Here, plaintiffs' claims are statutory, not constitutional. Although this distinction may seem academic, no case law has been found to support the idea that merely alleging violations of the ADA and Rehab Act, without more, establishes irreparable injury. To the contrary, injunctive relief has been denied in this Circuit because irreparable injury was absent in claims arising under the ADA. *See, e.g., Pazer,* 849 F.Supp. at 287 (plaintiff suing pursuant to the ADA made no showing of irreparable injury sufficient to entitle him to mandatory injunctive relief). Accordingly, we find that plaintiffs have not made a strong showing of irreparable harm or, indeed, even a sufficient showing.

### D. *Substantial Likelihood of Success on the Merits* [12]

#### 1. *Rehab Act Claim*

The Rehabilitation Act provides that "no otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. sec. 794. This includes instrumentalities of local governments. *Id.* at 794(b)(1)(A).

■ To prevail on a Rehab Act claim, plaintiffs must establish that: (1) they are "handicapped persons" under the Act; (2) they are "otherwise qualified" for the benefit that has been denied; (3) they are being denied benefits solely by reason of their dis-

abilities; and (4) the entity denying plaintiffs benefits receives federal financial assistance. *Flight v. Gloeckler, et al.,* 68 F.3d 61, 63, (2d Cir.1995) (citations omitted); *Rothschild v. Grottenthaler,* 907 F.2d 286, 289–90 (2d Cir. 1990); *Civic Assoc. of the Deaf v. Giuliani, et al.,* 915 F.Supp. 622, 638 1996 U.S.Dist. LEXIS 1498, at *47–48 (S.D.N.Y.1996).

In *Alexander v. Choate,* the Supreme Court defined the limits of the Rehab Act. 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Plaintiffs, who were disabled within the meaning of the Act, brought a class action to challenge Tennessee's across-the-board reduction in the number of annual days of in-patient hospital care covered by Medicaid. Plaintiffs claimed that this reduction discriminated against the disabled, since the cut in health care services would affect them disproportionately. The Supreme Court reversed the United States Court of Appeals for the Sixth Circuit, which had held that the plaintiffs had a cognizable claim under the Rehab Act. The Court emphasized that the Rehab Act protects handicapped persons' rights to "meaningful and equal access" to health care benefits and then explicitly stated that "the State is not required to assure the handicapped 'adequate health care' by providing them with more coverage than the non-handicapped." *Id.* at 306, 309, 105 S.Ct. at 722, 724.

■ It is therefore clear that the Rehab Act "mandates only that services provided non-handicapped individuals not be denied [to a disabled person] because he is handicapped," *Flight,* 68 F.3d at 63–64 (affirming dismissal of plaintiff's Rehab Act claim because the benefit plaintiff alleged he had been denied was only available to handicapped individuals); citing *P.C. v. McLaughlin,* 913 F.2d 1033, 1041 (2d Cir.1990). CERC's specialized services were not available to the non-disabled at all: they were specifically and exclusively created for the benefit of the developmentally disabled. Plaintiffs have identified no CERC-related service or benefit available to the non-disabled that is being denied to them. Nor

---

**12.** Both sides agree that plaintiffs are "disabled" and defendant is a "public entity" receiving federal financial assistance within the meaning of the Rehab Act and the ADA. These issues will accordingly not be addressed by the court.

have they identified any general health service that is being provided to the non-disabled that is being denied to them. Thus it is extremely unlikely that plaintiffs could prevail on their Rehab Act claim even if HHC had terminated, rather than merely relocated, CERC's services. Furthermore, plaintiffs have not shown that they were denied benefits "solely by reason of [their disabilities]" within the meaning of section 504. Two other programs (not for the disabled) were terminated as well. Yet it was the CERC program that was salvaged, albeit in another location and form. Accordingly, plaintiffs have not shown a substantial likelihood of success on their Rehab Act claim.

### 2. ADA Claim

■ The purpose of the ADA is to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."[13] 42 U.S.C. sec. 12101. In passing the ADA in 1990, Congress determined that forty-three million Americans have at least one disability, that they are a discrete and insular minority, and that they have been subjected to purposeful unequal treatment and relegated to a status of political powerlessness "based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society." 42 U.S.C. sec. 12101(a). The ADA must be broadly construed to effectuate its remedial purpose. *Tcherepnin v. Knight*, 389 U.S. 332, 335, 88 S.Ct. 548, 552, 19 L.Ed.2d 564 (1967); *Civic Assoc. of the Deaf*, 915 F.Supp. 622, 634, 1996 U.S.Dist. LEXIS 1498, at *33–34.

■ Title II of the ADA prohibits discrimination against the disabled in public services. Section 12132 provides, in relevant part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity ..." 42 U.S.C. sec. 12132. The legislative history of Title II clarifies Congress's intent to extend the Rehab Act's proscription to all state and local government programs and services irrespective of funding. *See* H.R.Rep. No. 101–485(II), 101st Cong., 2d Sess. 84 (1990) U.S.Code Cong. & Admin.News 1990 pp. 267, 303, 366–367. The regulations implementing Title II "confirm the uniformity of interpretation between the ADA and the Rehab Act." 28 C.F.R. sec. 35.103.

■ Thus, the test to determine whether Title II has been violated is essentially the same as is applied to the Rehab Act and case law interpreting the Rehab Act is relevant to claims arising under the ADA. To establish a violation of Title II, plaintiff must show that: (1) he or she is a "qualified individual with a disability," (2) he or she is being excluded from participation in or being denied the benefits of some service, program or activity by reason of his or her disability, and (3) the entity which provides the service, program or activity is a public entity. *See Civic Assoc. of the Deaf*, 915 F.Supp. 622, 634, 1996 U.S.Dist. LEXIS 1498, at *33–34; citing *Clarkson v. Coughlin*, 898 F.Supp. 1019 (S.D.N.Y.1995). The services which plaintiffs allege they are being denied in the instant case are those formerly offered by CERC: diagnostic and evaluative services for all clients and rehabilitative services for about 10% of clients.

■ As previously discussed, the disabled are not entitled to more public services than the abled receive, even if the disabled need them. *See, e.g., Alexander*, 469 U.S. at 301–02, 105 S.Ct. at 720–21. Given that plaintiffs have not shown they are being denied regular general health care or, indeed, denied any benefit or service provided to the abled, we cannot conclude that plaintiffs have a substantial likelihood of success on the merits. Further, plaintiffs have not even established that they are being denied the special services they previously received from CERC. Instead, these same services—diagnostic, evaluative, and rehabilitative—will be provided to CERC's former clients by, respectively, Morrisania and Lincoln. A

---

**13.** A disability is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual." 42 U.S.C. sec. 12102(2)(A).

relocation of services is simply not a denial or exclusion from services under the ADA.

Plaintiffs' attempt to liken this case to *Civic Assoc. of the Deaf* is unavailing. In *Civic Assoc. of the Deaf*, plaintiffs brought a class action pursuant to the ADA to challenge the City's plan to remove street fire alarm boxes. 915 F.Supp. 622, 1996 U.S.Dist. LEXIS 1498. Under the City's proposal, alarm boxes were to be removed and replaced with notification alternatives wholly inaccessible to the deaf. The court, stressing that the City had offered no alternative to accommodate New York's deaf community, concluded that the ADA had been violated because the non-disabled still had the benefit of reporting fires from the street, whereas the deaf, by reason of their disability, could not. *Id.* at 915 F.Supp. at 635, 636, 1996 U.S.Dist. LEXIS 1498, *38–39; 42. In contrast, plaintiffs here have not defined a service available to the non-disabled that they are being denied by reason of their disability. Accordingly, we find plaintiffs have no substantial likelihood of success on their ADA claim.

### IV. Conclusion

Plaintiffs have not shown they will suffer irreparable injury in the absence of an injunction compelling HHC to reopen CERC pending trial on the merits of their claims. Further, they have not made a substantial or clear showing of a likelihood of success on either their ADA or Rehab Act claims. Plaintiffs' motion for preliminary injunctive relief is, therefore, denied. In addition, plaintiffs' motion for class certification is denied as unnecessary.

SO ORDERED.

### ORDER

In accordance with the accompanying opinion, plaintiffs' motions in the above-captioned case for class certification and a preliminary injunction are hereby DENIED.

SO ORDERED.