Rachel DARIAN, Plaintiff,

v.

UNIVERSITY OF MASSACHUSETTS
BOSTON, Defendant.

Civ. Action No. 96–10745–NG.

United States District Court,
D. Massachusetts.

Sept. 16, 1997.

John D. Burke, Craig P. Pacernick, Law Offices of Gabriel Dumont, Boston, MA, for plaintiff.

Peter M. Michelson, Boston, MA, Kevin B. Callanan, Norwell, MA, for defendant.

### ORDER

GERTNER, District Judge.

## I. INTRODUCTION

Before me is a motion for summary judgment filed by the defendant, University of Massachusetts at Boston (hereinafter "the University") against the plaintiff, Rachel Darian ("Darian").[1]

Darian was pregnant in the fall of 1994, while enrolled as a senior nursing student at the University of Massachusetts. She became disabled during the semester and although her condition derived from her pregnancy, she contends it fits within the meaning of the Americans with Disability Act ("ADA") 42 U.S.C. § 12101 et seq. and related statutes. The University, she maintains, failed to make "reasonable accommodation" for her status. The issue is a significant one: the extent to which the ADA covers disabilities deriving from pregnancy, and what is "reasonable accommodation" in the context of a University with its unique demands.

The University contends it is entitled to summary judgment on Darian's claims for (1) violation of the Americans with Disabilities Act of 1991 ("ADA") (Titles II, III and V) 42 U.S.C. § 12101 et seq.[2] (2) violation of the Federal Rehabilitation Act of 1973, 29 U.S.C. § 794; and, (3) violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.[3]

For the reasons stated below, the University's motion for summary judgment is **ALLOWED.**

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted when all the relevant pleadings, viewed in the light most favorable to the non-moving party, present no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Aponte–Santiago v. Lopez–Rivera, 957 F.2d 40, 41 (1st Cir.1992); Griggs–Ryan v. Smith, 904 F.2d 112, 115 (1st Cir.1990). Courts may grant summary judg-

---

1. Defendant Norwell Visiting Nurses Association ("NVNA") had also moved for summary judgment. On June 23, 1997, however, the parties filed a stipulation of dismissal, which indicated that the plaintiff had dismissed all her claims—state and federal—against NVNA with prejudice. As a result, the University is the only remaining defendant in the case.

2. The ADA is divided into several Titles. Title I prohibits discrimination by employers, Title II prohibits discrimination by public entities, Title III applies to public accommodations, and Title V prohibits retaliation and coercion.

3. On July 22, 1996, the plaintiff amended her complaint and withdrew her state law claims under Mass. Gen. Laws ch. 151C, ch. 93, §§ 102 and 103 against the University and filed a three count suit against it in Massachusetts Superior Court.

ment even when issues of intent and motive are part of the ultimate claim if the non-moving party relies upon conclusory allegations, improbable inferences, and unsupported speculation. *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

## III. *FACTS*

### A. *Darian Enrolls in Nursing 410*

In the fall of 1994, Darian was a senior nursing student at the University of Massachusetts. She was scheduled to graduate with a Bachelor of Science degree in Nursing in December of 1994. During the 1994 fall semester, Darian enrolled in "Nursing 410, Community Health Nursing" (hereinafter "Nursing 410"), a clinical course required for the completion of her degree. Nursing 410 included both a clinical and classroom component.

For the clinical component of the course, Darian was assigned to the Norwell Visiting Nurse Association (hereinafter "NVNA"). At NVNA, non-hospitalized patients receive care from visiting nurses in their homes. The University offered Nursing 410 students a list of eight to ten possible clinical sites; each student then selected and ranked three choices; finally, the University attempted to place each student in one of those three choices.[4] Darian ranked NVNA as her top choice for a clinical placement; the University placed her there. Professor Cecilia O'Malley ("Prof.O'Malley") served as Darian's clinical instructor at NVNA.

Nursing 410 required students to attend two clinical days a week—Tuesdays and Thursdays—for roughly six hours per day. The students had to work at a site where they could receive hands-on experience; at NVNA, this meant that students left the NVNA site to visit patients and provide care. Prof. O'Malley gave all students, including Darian, orientation materials; these materials explicitly stated that attendance in both the clinical and classroom portions was a crucial component of the program. Students

had to complete all required clinical time, and if they missed clinical time, they had to make it up.

### 1. *The Nursing 410 Regime*

At NVNA, a typical clinical day consisted of reviewing the assignment book, examining a patient's record, talking to the clinical nurse, calling a patient to set up a visit, visiting the patient, returning to the clinical site, and discussing the patient visit.

The classroom requirement for Nursing 410 included readings, lectures, a mid-term and final exam, one ten to twelve page paper, and a group project with other nursing students. Darian's principal instructor for the classroom part of the course was Professor Linda Dumas ("Prof.Dumas").

### B. *Darian's Difficult Pregnancy*

In May of 1994, Darian became pregnant. From the beginning of the fall semester, in September 1994, until October 24, 1994, she attended clinical sessions regularly, and she was a good student. She made patient visits, took good patient notes, successfully completed the first twelve clinical days, and received an "A" on her mid-term examination. In fact, Darian was the class secretary, a member of the Golden Key National Honor Society, and had a 3.65 grade point average.

But on October 24, 1994, she began to experience serious difficulties with her pregnancy. Darian suffered from severe pelvic bone pains, premature uterine contractions, irritation of the uterus, back pain, poly hydrominus, increased heart rate, edema, and a large fetus. She contends that all these symptoms adversely affected her ability to walk, sit, sleep, and learn.

### 1. *Pregnancy Restrictions*

On October 24, 1994, Darian was examined by her obstetrician, Dr. Dale Weldon ("Dr.Weldon"). Dr. Weldon ordered her to remain on full bed rest for one week and return for reevaluation on October 28, 1994.

---

4. Massachusetts state regulations limit the number of nursing students that can be in any clinical site to ten. The regulations promulgated by the Massachusetts State Board of Registration in

Nursing, 244 C.M.R. § 6.00 *et seq.; see* 244 C.M.R. § 6.05(g), specify that "[a] teacher/student ratio in clinical practice in a structured setting shall not exceed 1:10."

Darian did so. She remained out of class, also missing clinical days at NVNA on both Tuesday, October 25, 1994 and Thursday, October 27, 1994. She returned to Dr. Weldon for re-evaluation on October 28, 1994. Dr. Weldon prescribed partial bedrest, but said she could resume the course, provided that Darian avoided seeing patients.

On October 31, 1994, Prof. O'Malley telephoned Darian at home. During this conversation, Darian informed Prof. O'Malley of her doctor's bedrest orders and the restriction on patient visits. O'Malley responded that she would allow Darian to "stay in the office until she was capable to see patients."

Darian returned to the clinical program the next day, November 1, 1994. She worked with a triage nurse at the NVNA, reviewed patient charts, but did not actually see any patients. While at the clinical program Darian experienced back pain, pain in her left hip, and, toward the end of the day, uterine contractions.

Prior to Darian's departure, Prof. O'Malley addressed the students and discussed the case of another Nursing 410 student, the previous semester, who had been exposed to the chicken pox virus. O'Malley noted that this student had not been able to go out to make patient visits for fear of infecting patients.[5]

### a. *November 3, 1994 Accommodations*

On November 3, 1994, Darian returned to the NVNA clinical program. She asked Prof. O'Malley if she could take patient records home and review them with her feet elevated. Prof. O'Malley agreed and Darian took home some patient charts in the mid to late morning and returned with them in the early afternoon.[6]

On November 8, 1994, following two nights of severe pelvic bone pain, back and hip pain, general fatigue, and queasiness, Darian returned to the clinical program. Almost immediately, she requested that she be allowed to return home early. Prof. O'Malley did not send Darian home; instead, she assigned her to the NVNA home health aid department with no patient assignments. While in the department, Darian's activities were light. She sat most of the time and observed the person who scheduled individuals for home health care. After a short time, however, Darian found it difficult to sit and left around 11:00 a.m.[7] At the time she left, Darian was experiencing severe pelvic bone pain and queasiness.

Overall, from October 25, 1994, until November 8, 1994, Prof. O'Malley did not require Darian to see patients and referred to this accommodation as a "modified schedule."

### 2. *The Phone Conversations*

Later in the afternoon, on November 8, 1994, Prof. O'Malley called Darian at home, inquired about her illness and stated, "this is not working out." Prof. O'Malley also stated to Darian that "this [Nursing 410] is a clinical, not a home study course," and said that the pivotal component of Nursing 410 was to provide clinical care.

Prof. O'Malley then contacted Prof. Dumas and they discussed one option: Darian would take an incomplete in the clinical portion of the course, but would still finish the classroom portion of the course, including papers and exams. She would return in the next semester, after the birth of her baby, to complete the clinical portion. This would mean that Darian would not graduate until

---

5. The student who had been exposed to chicken pox was Ms. Mary Kate Christian ("Christian"). Christian was already a Registered Nurse who went back to school to get her Bachelors Degree in Nursing. Christian was unable to make patient visits for two weeks, that is, four clinical days, before returning. Although Christian did not make home visits over those four days, she did not miss any time of her clinical placement; she attended all four, six-hour days of clinical time during that period. During the period Christian was unable to see patients, she organized an immunization outreach program, ran an immunization clinic, distributed leaflets and flyers, and reviewed and analyzed patient charts.

6. In subsequent conversations between Darian and officials from the University, this accommodation was referred to as "the November 3rd modifications."

7. Darian told another student to inform Prof. O'Malley that she had left early. Prof. O'Malley claims she did not learn that Darian had left until she returned to NVNA around 1:00 p.m. and discovered Darian was not there.

June 1995. When Prof. O'Malley told Darian about this option, Darian protested, stating that she could complete the clinical program and still graduate on time with some modifications.[8]

In a subsequent phone call, later on November 8, 1994, Darian reiterated to Prof. O'Malley that she wanted to return to the clinical program and finish on time. Prof. O'Malley responded that Darian would have to see patients and would have to produce a note from her doctor detailing specific restrictions. She also stated that she believed it could be unsafe for Darian to return to clinical instruction as a result of her difficult pregnancy.

## C. *Discussions with University Officials*

### 1. *Darian and Dr. Winfrey Meet*

On November 10, 1994, Darian and her husband met with Doctor Marion Winfrey ("Dr.Winfrey"), the undergraduate program director at the University, to discuss possible accommodations for Darian's health problems. Dr. Winfrey stated to the couple that if Darian's condition did not allow her to fulfill clinical obligations, despite the accommodations that were made for her, she would have to consider taking an incomplete. The Darians and Dr. Winfrey discussed the possibility of a transfer to another clinical site, one where students were not required to go into patients' homes. Darian specifically mentioned the Pine Street Inn as an alternative.

In addition to discussing possible accommodations, Darian asked Dr. Winfrey what Prof. O'Malley meant by it being "unsafe" for Darian to return to clinical. Darian claims that Dr. Winfrey's responded with a question: "if something happened, who would you hold liable?" Darian also asked about the ADA and told Dr. Winfrey she felt she was being discriminated against.

On November 14, 1994, upon Dr. Winfrey's request, Darian provided her with a doctor's note, which stated that Darian "may see one patient per clinical day. She may not climb stairs." In a phone call with Dr. Winfrey, Prof. O'Malley agreed that Darian could return to the clinical program on these conditions.

### 2. *Darian and Prof. O'Malley's Confrontation*

On November 15, 1994, Darian returned to the clinical program. Prof. O'Malley had found a patient in need of care whose home only had one step. In fact, this home had two NVNA patients. Prof. O'Malley offered to let Darian see both of them, but considering the doctor's note with its one patient restriction, Darian said she preferred to see only one patient. Prof. O'Malley also informed Darian that there would be a flu clinic later in the day, and that she could make up missed clinical time by attending that program. Darian agreed.

But after an early morning meeting with students, Prof. O'Malley met privately with Darian in the NVNA conference room. At this meeting, Prof. O'Malley accused Darian of being a "backstabber." She told Darian that she believed that Darian should take an incomplete in Nursing 410.[9] When Darian said she did not want the incomplete because she wanted to be home with her baby, Prof. O'Malley criticized her by saying that she simply did not want to find a babysitter for two days a week. These comments by Prof. O'Malley so upset Darian that she handed back the patient's file, told Prof. O'Malley to find someone else to see the patient, and got up and left the NVNA in tears.

Darian never returned to clinical instruction after that day. According to Darian, her psychiatrist had advised her to discontinue the program since it was "taking its toll."[10] Significantly, at no point in this conversation, did Prof. O'Malley revoke the one patient per

8. Darian's reluctance to postpone her graduation stemmed from two sources: (a) her desire to be with her baby after it was born and (b) her desire to graduate with friends in her class.

9. The defendant accepts Darian's version of this conversation for summary judgment purposes only.

10. Darian concedes that no one at NVNA knew she was seeing a psychiatrist.

day/no stairs accommodation to which the University had already agreed.

As of November 15, 1994, the Nursing 410 students were scheduled to see patients on only four remaining clinical days, November 15, 17, and 22 and December 1, 1994. At this point, Darian had already missed clinical days scheduled for October 25, October 27, and November 10, 1994.[11]

### 3. *Darian Meets with Dean Cherry*

On November 21, 1994, Darian and her husband met with Brenda Cherry ("Dean Cherry"), Dean of the School of Nursing at the University. Darian complained to Dean Cherry that she felt harassed by Prof. O'Malley statements. Darian and Dean Cherry also discussed possible accommodations, but Dean Cherry informed Darian that the clinical instructors, including Prof. O'Malley, would make any decisions about appropriate alternate learning experiences. Dean Cherry subsequently sent Darian a letter dated November 23, 1994, stating these conditions.[12]

On November 27, 1994, Darian sent a letter to Dean Cherry, in which she asked to be administratively withdrawn from Nursing 410 in an effort to avoid a failing grade. Dean Cherry denied her request, taking the position that Darian did meet the requirements of an administrative withdrawal.[13] In addition, Dean Cherry denied Darian's request for a voluntary withdrawal, as the time for voluntary withdrawal had passed.[14]

### 4. *The November 26, 1994 Dumas Letter*

On November 26, 1994, Prof. Dumas, the teacher for the classroom portion of Nursing 410 and its course coordinator, sent a letter to Darian. Prof. Dumas also believed that the best course of action was for Darian to complete the classroom portion of the course, take an incomplete in the clinical portion of the course, and complete the clinical portion the next semester. She stated that given Darian's current restrictions—one patient visit per day and no stairs—there were no remaining options as of November 26, 1994, which would still meet Nursing 410's clinical objectives.

In her letter, Prof. Dumas stated that Darian would have to make up approximately thirty hours of missed clinical time, a task made virtually impossible given her restrictions. She reiterated the purpose of the clinical program was to provide hands-on experience to future professionals in a field. She expressed concern about Darian's ability to complete one of the academic assignments of Nursing 410—the group project assignment—since she had missed so many classes.

Prof. Dumas then stated:

> Ms. Margaret Doherty, the executive director of Norwell Visiting Nurse Association has requested that you not work on site until after your pregnancy. She has serious concerns about your health and about the liability of the agency should you jeopardize your health and your pregnancy in the course of your clinical activity.

Doherty denied making these comments and that these statements had been falsely attributed to her. Dumas did not recall ever talking with Doherty about these matters and stated that she inferred the statements through conversations with Prof. O'Malley.

---

11. Darian contends she did not "miss" any clinical time on either October 25 or 27, since she reviewed patient charts at home on those days.

12. The letter stated:

> To address your questions regarding acceptable alternative clinical experienced and the amount of clinical time you must make-up, I have asked Prof. O'Malley to communicate with you in writing. She will identify alternative clinical learning experiences and the amount of make-up time she has approved for you.

13. Darian's understanding that "administrative withdrawal" allows the Dean to withdraw someone from a course up until the last day of classes, if they are "some sort of health hazard or health risk." Administrative withdrawal may be required for three reasons: (a) failure to comply with administrative requirements; (b) forgery or falsification of information on an official University form; or (c) certified physical health or mental health problems of a hazardous nature.

14. Had Darian been granted an administrative withdrawal, she also would not have been able to graduate until June 1995.

### D. *Darian receives an "F" in Nursing 410.*

Darian did not take the Nursing 410 final exam, did not hand in her paper, and did not participate in the group project. Dean Cherry sent a letter dated December 22, 1994 in which she recommended that Darian contact Prof. Dumas or Prof. O'Malley to discuss ways in which she could complete the work needed for her degree. Darian did not do so; she never completed any of the clinical time she had missed. She received an "F" as her grade in Nursing 410.

Next, Darian appealed her grade to the Student Affairs Committee at the University. The Student Affairs Committee considered the appeal and granted Darian permission to take Nursing 410 again and to complete her requirements for a nursing degree. According to Dr. Winfrey, this is not an opportunity that would be given to all students. In March 1995, Dr. Winfrey wrote and called Darian to see if she intended to enroll in Nursing 410 in the fall of 1995. Darian never responded.

On April 17, 1996, Darian filed her complaint in this court.

## IV. *DISCUSSION*

### A. *The ADA and The Federal Rehabilitation Act*

In passing the ADA, Congress recognized that physical or mental disabilities affect more than 43,000,000 Americans whom society has tended to isolate or segregate. 42 U.S.C. § 12101(a)(1) and (2). Widespread disability discrimination, according to the Congress, in the areas of employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services necessitated the legislation. 42 U.S.C. § 12101(a)(3).

 Title II of the ADA provides that "no qualified individual, by reason of such disability, may be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. The University is a public entity since it is a public institution of higher learning, a state agency and a publicly funded state organization. *See, e.g., Coleman v. Zatechka,* 824 F.Supp. 1360, 1367 (D.Neb.1993) (holding the University of Nebraska, established by the state legislature as a state institution, was a "public entity" within the meaning of the ADA).

### 1. *Prima Facie Case*

 To prevail on a claim for violation of Title II of the ADA, the plaintiff must show: (1) that she is a qualified individual with a disability; (2) that she was either excluded from participation in or denied the benefits of some public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and, (3) that such exclusion, denial of benefits or discrimination was by reason of the plaintiff's disability. *McDonald v. Commonwealth of Massachusetts,* 901 F.Supp. 471, 478 (D.Mass.1995); *see also Lincoln CERCPAC v. Health and Hospitals Corp.,* 920 F.Supp. 488, 497 (S.D.N.Y.1996). An entity discriminates against a disabled individual when it fails to make reasonable modifications for that person. If the modifications would fundamentally alter the nature of the institution, however, it is not obliged to make the modifications. 42 U.S.C. § 12182(b)(2)(A)(ii).

 The ADA analysis has its roots in an earlier law, the Rehabilitation Act. It was the precursor of the ADA; Rehabilitation Act cases provide precedent for the ADA. *Dubois v. Alderson–Broaddus College, Inc.,* 950 F.Supp. 754, 760 (N.D.W.Va.1997). In enacting the ADA, "Congress intended Title II to be consistent with section 504 of the Rehabilitation Act. This desire for consistency is evident from the ADA statutory scheme itself." *Lincoln CERCPAC,* 920 F.Supp. at 497. Accordingly, the Court believes its discussion of the issues in this case apply to the plaintiff's claims under both the ADA and the Rehabilitation Act.

 To prove a violation of the Rehabilitation Act under § 504, a plaintiff must prove that: (1) she is a "handicapped individual"; (2) she is "otherwise qualified" for participation in the program; (3) the program receives "federal financial assistance"; and,

(4) she was "denied the benefits of" or "subject to discrimination" under the program. 29 U.S.C. § 794; *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991) (citing *Strathie v. Department of Transp.,* 716 F.2d 227, 230 (3d Cir.1983)).[15]

## 2. *Is Darian Disabled Within the Meaning of the ADA?*

The first issue raised by Darian's complaint is whether she suffers from a disability. This argument was initially pressed by the defendant in its motion to dismiss—a motion the Court denied. Since it is a predicate for any findings under the ADA or the Rehabilitation Act, I will address it at this time.

■ The analysis of whether a plaintiff has alleged a "disability" is basically the same under the Rehabilitation Act and the ADA. The ADA defines "disability" as either (1) a physical or mental impairment that substantially limits a major life activity; (2) a record of such impairment, or (3) being regarded as having such impairment. 42 U.S.C. § 12102; *see also* 29 U.S.C. § 794(d).

Federal regulations promulgated under the ADA further define "disability." In the appendix to the regulations of Title I, pregnancy is specifically cited as an example of a condition *not* considered an impairment under the ADA because it is not the result of a

physiological disorder. 29 C.F.R. § 1630.2(h), App. (1995). Darian, however, cites to the Equal Employment Opportunity Commission Compliance Manual which states that "complications resulting from pregnancy" may be considered impairments. *See* EEOC Compliance Manual, Vol.2, EEOC Order 915.002, § 902.2(c)(3).[16] While the regulations promulgated by the EEOC clarify the terms of the ADA,[17] they are broadly written. "The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment [which] may be disabling for particular individuals but not for others ..." 29 C.F.R. § 1630.2(j). By its terms, though pregnancy per se is not covered by the ADA, the Act does not necessarily exclude all pregnancy-related conditions and complications.

## 3. *Analysis of the Issue by Other Courts*

Most courts that have considered this issue have held that pregnancy-related symptoms are *not* disabilities under the ADA; however, most of the cases involve factual and legal contexts which are distinguishable from the instant case.

In *Tsetseranos v. Tech Prototype, Inc.,* 893 F.Supp. 109 (D.N.H.1995), the court granted the defendant's motion for summary judg-

---

**15.** Section 504 of the Rehabilitation Act states that "No otherwise qualified individual with a disability ... shall, solely by reason of her·or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ..." 29 U.S.C. § 794.

**16.** It is important to note, however, that both the Appendix and the EEOC Compliance Manual pertain only to Title I of the ADA, which concerns employment discrimination. In this case, the plaintiff's claim did not arise from employment; instead, she alleges the defendant violated Title II (public entities), Title III (public. accommodations), and Title V (prohibition against retaliation). The definition of "disability" provided in·the appendix to the regulations for Title II does not mention pregnancy at all. See 28 C.F.R. § 35.104, App. A (1995). While the regulations for Title I are apparently intended to be applied in employment discrimination cases, they are instructive for this case.

**17.** 29 C.F.R. § 1630.2 et seq. (1996) sets forth the following definitions:

(h) Physical or mental impairment
(1) Any physiological disorder, or condition ... affecting one or more of the following body systems: ... musculoskeletal ... reproductive, genito-urinary
(i) Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, ... and working.
(j) Substantially limits ...
(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

8

ment on a Title I ADA claim. The plaintiff had developed ovarian cysts while pregnant. She alleged her termination was the result of absences from work, which in turn resulted from the cysts. In holding that the plaintiff did not have a disability, the court relied on the EEOC guidelines which excluded both pregnancy and temporary, non-chronic impairments of short duration. *Id.* at 119.

Similarly, in *Villarreal v. J.E. Merit Constructors, Inc.*, 895 F.Supp. 149 (S.D.Tex. 1995), the court granted the defendant's motion to dismiss a Title I ADA claim, and held that "pregnancy and related medical conditions are not 'disabilities' as that term is defined by the ADA." *Id.* at 152. As in *Tsetseranos*, the court relied on the EEOC regulations and saw little need to extend the ADA to cover pregnancy because of the existence of Title VII, 42 U.S.C. § 2000(e)–2(a), and the PDA, 42 U.S.C. § 2000e(k). Other courts have taken similar positions, applying the regulations under Title I and/or the citing to the adequacy of other employment causes of action.[18]

Darian is different. Darian's discrimination claims are not based on employment, but on access to and accommodations in education. As discussed above, the Title I regulations may not necessarily apply in this case. In addition, Darian, unlike these other plaintiffs, cannot seek relief through Title VII or the PDA.

Moreover, the physical condition which is alleged to be disabling is different for Darian than other plaintiffs. In *Villarreal*, the plaintiff simply asserted that she was fired because she was pregnant. She cited to no particular disabling conditions. Darian

states that she suffered from specific, medical conditions which, though caused by her pregnancy, nevertheless qualify as a disability under the ADA.

Some cases—in my judgment, the more persuasive ones—have emphasized the nature of the disability, regardless of its *origin*. In *Patterson v. Xerox Corp.*, 901 F.Supp. 274 (N.D.Ill.1995), for example, the court denied a motion to dismiss a Title I ADA claim. The plaintiff suffered from severe back pain, the result of both her pregnancy and a prior back injury. Following her doctor's advice that she take a number of short walks during the day, the plaintiff took frequent breaks from her desk job. The plaintiff alleges she was fired because of this need for accommodation. The court rejected the defendant's argument that the plaintiff had no claim since her condition was not permanent and found the allegations of back pain sufficient to survive a motion to dismiss. *Id.* at 278.

In *Garrett v. Chicago Sch. Reform Bd.*, No. 95–C–7341, 1996 WL 411319 (N.D.Ill. July 19, 1996), the court also declined to dismiss a similar ADA claim, filed by a student.[19] The plaintiff alleged that morning sickness caused her to miss a number of classes, which resulted in an automatic failure. In response to the defendant's claim that the condition was a transitory, nonchronic impairment of short duration not covered by the ADA, the court stated that the determination of the duration or severity of the illness was a factual question "not properly decided on a motion to dismiss." *Id.* at *2.

Finally, in *Hernandez v. City of Hartford*, 959 F.Supp. 125 (D.Conn.1997), the plaintiff

---

**18.** *See, e.g., Jessie v. Carter Health Care Center, Inc.*, 926 F.Supp. 613, 616 (E.D.Ky.1996) (dismissing ADA claim brought by an employee who was fired, because "no unusual circumstances exist" with respect to the pregnancy though the complications caused employee to miss work); *Gudenkauf v. Stauffer Communications, Inc.*, 922 F.Supp. 465, 473 (D.Kan.1996) (granting summary judgment against the plaintiff, and holding that morning sickness, stress, nausea, back pain, swelling and headaches were not disabilities under the ADA because "all of the physiological conditions and changes related to a pregnancy ... are not impairments unless they exceed normal ranges or are attributable to some disorder."); *Richards v. City of Topeka*, 934 F.Supp.

378 (D.Kan.1996) (granting summary judgment against plaintiff who made no allegations that her pregnancy was abnormal or unusual, but brought discrimination claim after she was denied request to be put back on full duty after announcing pregnancy); *Johnson v. A.P. Products, Ltd.*, 934 F.Supp. 625 (S.D.N.Y.1996) (dismissing claim where warehouse clerk suffered pregnancy complications rendering her temporarily unable to work as warehouse clerk).

**19.** The court did not specify which title of the ADA was alleged to be violated, but it does not appear to be a Title I case since it did not concern an employment relationship.

asserted that her pre-term labor constituted a disability under § 504 of the Rehabilitation Act and Title II of the ADA. The defendant moved for summary judgment on the ground that plaintiff was not disabled, was not a qualified individual with a disability, and had been reasonably accommodated. The court held that premature labor was a physical impairment under the Rehabilitation Act and the ADA and that the plaintiff's disability discrimination claim was cognizable under Title II of the ADA. *Id.* at 130.

The *Hernandez* case provides the most persuasive analysis of this issue. The court conceded that pregnancy and pregnancy-related medical conditions have been held not to be physical impairments. But it observed that the federal regulations do "not explicitly exclude pregnancy-related impairments, provided that they are a result of a physiological disorder." *Id.* Defining "physiologic" as a "characteristic of or conforming to the normal functioning or state of the body or a tissue or organ," the court logically concluded that a physiological disorder is an abnormal functioning of the body or a tissue or organ. *Id.* (quoting *Dorland's Medical Dictionary* (27th ed.1988)). In a normal pregnancy, women do not experience premature labor, so the court held that the plaintiff did suffer from a disability. *Id.*

As in *Hernandez*, Darian's conditions were not a function of a normal pregnancy, but rather a physiological disorder with disabling consequences. In a normal pregnancy, a woman does not experience severe pain and paralyzing uterine contractions, nor do the symptoms a pregnant woman typically experiences substantially interfere with her ability to fully participate in an educational program.

Darian endured severe pelvic bone pain, uterine contractions and irritation of the uterus, uterine pain and back pain. These are not minor or insignificant symptoms. They limited several major life activities for Darian: education, manual tasks, walking, sitting, sleeping, and learning.[20]

The fact that the cause was perhaps a "normal" condition does not change its impact on Darian's life. Other "normal" conditions could have profoundly disabling consequences—degenerative back problems which result from normal aging, for example—but the ADA does not exclude them from its protections. Indeed, as noted above, the ADA focuses on how the disability affects the individual, not on its cause or its label: "The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment [which] may be disabling for particular individuals but not for others ..." 29 C.F.R. § 1630.2(j).[21]

In the final analysis, the ADA is remedial legislation and should be broadly construed. *See Tcherepnin v. Knight,* 389 U.S. 332, 335, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *Kinney v. Yerusalim,* 812 F.Supp. 547, 551 (E.D.Pa.), *aff'd,* 9 F.3d 1067 (3d Cir.1993), *cert. denied,* 511 U.S. 1033, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994). I find that Darian's conditions do constitute a disability under the ADA, and required the University to make efforts to reasonably accommodate her disability.

## B. *Application of the ADA to Darian's Case: The Issue of Reasonable Accommodation*

There is no question that the University is a public entity and that Darian did not complete Nursing 410. The central inquiry in this case is whether the University excluded Darian from a program based on her disabili-

---

**20.** The conditions appear to have begun in October—the last phase of her pregnancy. Arguably, the condition was of limited duration. 29 C.F.R. § 1630.2(j)(2) provides that the duration of an injury is relevant to its coverage under the ADA. This factor favors the defendant, but, standing alone, is not dispositive.

**21.** Darian has also alleged, in the alternative, that the defendant discriminated against her on the basis that it regarded her as having a disability. Under this approach, she does not have to allege an actual disability, only that the defendant treated her as if she had one. *See* 42 U.S.C. § 12102(2)(C); 28 C.F.R. § 35.104, App. A at 454. Since I find that she did suffer from a disability, I need not, and do not, consider this ground.

ty and whether it made sufficient efforts to offer her reasonable accommodations for that disability. *Wynne v. Tufts Univ. Sch. of Medicine [Wynne II]*, 976 F.2d 791, 793 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). These are the questions that comprise the issue of whether Darian was a "qualified individual with a disability."

It is clear from the facts that both the University and Darian agreed on the one patient per day/no stairs accommodation. Darian's doctor even proposed the accommodation, and the nursing administrators at the University agreed that she could complete Nursing 410 with these restrictions in place. The only question is whether or not this accommodation was a meaningful one and whether it went far enough.

Typically, this inquiry is resolved at trial rather than on summary judgment because a reasonableness determination implicates both law and fact. In *Wynne I*, the district court denied Tuft's motion for summary judgment because "questions of fact remain regarding both the reasonableness of the accommodations made by the defendant and the extent to which plaintiff adhered to the program it did devise for the plaintiff." *Wynne v. Tufts Univ. Sch. of Medicine [Wynne I]*, 932 F.2d 19, 22 (1st Cir.1991), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993).

In *Brennan v. Stewart*, the court held that the reasonable accommodation issue should "be decided as an issue of fact—meaning, of course, that it is one for the trial court or jury." *Brennan v. Stewart*, 834 F.2d 1248, 1262 (5th Cir.1988).

Yet certain limits to the requirement of reasonable accommodation do apply. An accommodation is not reasonable if it imposes any "undue financial or administrative burdens" or if it requires a "fundamental alteration in the nature of [the] program." *School Bd. v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).

### 1. *Educational Context*

The First Circuit has recognized that "unique considerations that come into play when the parties to a Rehabilitation Act case are a student and an academic institution." *Wynne II*, 976 F.2d at 793. The court concluded that a court should consider the following:

> If the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means, their feasibility, cost and effect on the academic program, and came to a rationally justifiable conclusion that the available alternatives would result in lowering academic standards or requiring substantial program alteration, the court could rule as a matter of law that the institution had met its duty of seeking reasonable accommodation ... Only if essential facts were genuinely disputed or if there were significantly probative evidence of bad faith or pretext would further fact finding be necessary.

*Id.* I find that the record contains undisputed facts demonstrating that the University reasonably accommodated Darian's disability. Any further accommodation beyond that which it agreed to on November 15, 1994, would have lowered its academic standards or substantially altered its academic requirements. Nor is there evidence of pretext or bad faith. *See infra* note 23. As a result, I rule, as a matter of law, that the University met its obligation to offer Darian a reasonable accommodation.

### 2. *The Role of Nursing 410*

Nursing 410 required two clinical days a week; a clinical day included six hours per day at a site where nursing students received hands-on nursing experience. Darian's professor, Prof. O'Malley, made this requirement explicit at a meeting held at the beginning of the semester. She highlighted the rules: attendance was a key component of the program, and if a student missed clinical time, he or she had to make it up.

Darian contends that the problems that she was experiencing had no effect on her ability to deliver patient care, but only interfered with her access to patients. As a result, she faults the University for her missed clinical time, rather than herself. I disagree.

### a. *"One Patient Per Day/No Stairs"*

The University *agreed* to the final accommodation requested by Darian, i.e. "one patient per day/no stairs." It never rescinded this offer—instead, Darian, unilaterally, after an upsetting conversation with Prof. O'Malley, dropped out of the Nursing 410 course. She left the program because she was upset—not because the University forced her to leave. *See Dubois v. Alderson–Broaddus College, Inc.,* 950 F.Supp. 754, 760 (N.D.W.Va.1997) (holding that plaintiff who withdrew from a class to avoid a failing mark did not prove that the defendant caused his removal from its physician assistant's program).

### b. *An Incomplete*

In addition, prior to the "one patient per day/no stairs" offer, the University offered Darian the opportunity to complete the classroom portion of Nursing 410, take an incomplete on the clinical portion, and return the following semester to only complete the remainder. She refused this offer—insisting on further modifications—because she preferred to graduate on schedule in December 1994.

These actions doom Darian's claim. Once a defendant has offered a reasonable accommodation, a plaintiff has the obligation to either accept it or demonstrate that it is unreasonable. Offering the incomplete was a reasonable accommodation. As of November 8, 1994, Darian could barely tolerate sitting. She had not seen patients for over three weeks and missed several clinical days; missing both October 25 and 27; leaving the clinical site on November 3 and November 8 because of the extreme discomfort she was in due to her pregnancy. The incomplete would have solved these problems since Darian would not have been required to attend clinical instruction while suffering from these complications. *See, e.g., Schmidt v. Methodist Hospital of Indiana, Inc.,* 89 F.3d 342, 344 (7th Cir.1996) (holding that hospital did offer reasonable accommodations when it offered nurse additional training in unit to which he was assigned and opportunities to resign and reapply for employment in another nursing unit, though it refused to grant nurse's request for transfer to another nursing unit).

Darian refused the option of an incomplete, and abandoned the program even when the University went even further, agreeing to the limitation of one patient per day, with no stairs. *See Schmidt,* 89 F.3d at 344–345 (holding nurse was not "qualified individual with a disability" within meaning of the ADA due to his rejection of reasonable accommodations offered by the hospital; plaintiff wanted transfer to a different department; defendant offered options of additional training; resignation followed by reapplication; and termination). *See also Hankins v. The Gap, Inc.,* 84 F.3d 797, 802 (6th Cir.1996) (affirming summary judgment and holding plaintiff was not a qualified individual with a disability because she rejected such reasonable accommodations as medical leave and on-site medical treatment; instead, plaintiff insisted on seeking transfers to other departments which were neither suitable nor available).

### c. *Extreme Accommodations*

The other accommodations demanded by Darian would have harmed the University's efforts to require serious clinical attention for its nursing students. Darian missed the clinical program on both October 25 and October 27, 1994; she took patient charts and reviewed them at home. On November 3, 1994, Darian asked again if she could review patient records at home with her feet elevated. Finally, on November 8, 1994, Darian found it difficult to sit and went home early. In her communications with the Nursing 410 administrators, Darian continued to reiterate her request for the "November 3rd modifications," or "the accommodations that had been granted earlier,"—meaning that she be allowed to take patient records home and review them with her feet up.

█ The University viewed these modifications as temporary—a short buffer period until Darian felt better. Clearly, the University could not have allowed Darian to continue this pattern for the remaining eight weeks left in the course. It certainly had no obligation to permit Darian to forego providing patient care, forego half of the required clini-

cal assignments, and still receive credit for the course. An educational institution is not required to "accommodate a handicapped individual by eliminating a course requirement which is reasonably necessary to proper use of the degree conferred at the end of a course of study." *Doherty v. Southern College of Optometry*, 862 F.2d 570, 575 (6th Cir.1988) (involving defendant's requirement that students be familiar with clinical tools), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). Darian herself concedes the central focus of Nursing 410 is involvement with patients. A waiver by the University not only of its attendance requirement but also patient care would have been a substantial—indeed extreme—accommodation. *See Doherty*, 862 F.2d at 575.

Darian attempts to generate an issue for trial by focusing on other accommodations she claims the University could have made, but did not do so.

### 3. *Alternate Sites for Clinical Time*

In her meetings with Dr. Winfrey and Dean Cherry, Darian requested a transfer to some of the seven other clinical sites so that she could receive patient contact. None of the accommodations proposed were reasonable or feasible, so they do not support Darian's claims. *See, e.g., Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir.1996) (holding that two transfer options suggested by plaintiff were not reasonable accommodations since one was unsuitable for someone with a disability like plaintiff's, and the other unavailable during plaintiff's shift hours). At her meeting with Dr. Winfrey, Darian mentioned the Pine Street Inn, and with Dean Cherry, the Student Health Center. I will address each in turn.[22]

First, Darian suggested the examination room at the NVNA. Students situated in the examination room could conduct blood pressure examinations and medical assessments. The NVNA also provided immunization clinics, health fairs, and flu clinics. But given

NVNA's low in-house treatment of patients, there were frequent days in which the NVNA had no patients; in fact, there was no guarantee that there would be any patients seeking treatment on the clinical days for Nursing 410.

Second, Darian suggested the University's Student Health Center. But all clinical sites have to be approved by the State Board of Registration in Nursing, and the Student Health Center was not an approved site.

Third, Darian suggested the Brookside Community Health Center. Prof. O'Malley had, on occasion, taken students with her to the Center, but these were instances where the students were making up clinical time. This was an option for one day of makeup, not a daily or regular activity. Moreover, Prof. O'Malley testified that she typically saw twenty-two patients per day—a regime Darian could not have followed.

In addition, Darian proposed the Arlington & Malden Council on Aging. The Council did, at the time, have only nine students and would have had room for Darian. But its working environment was very similar and comparable to NVNA. It required outside visits to the elderly to provide nursing care.

Finally, Darian asked about a transfer to the Pine Street Inn. The Inn is one of the most popular clinical sites available to student nurses in Nursing 410. It already had a full complement of ten student nurses.

### 4. *Conclusion*

The undisputed facts show that the University neither ignored Darian nor turned a deaf ear to her situation. To the contrary, the University took the following steps:

(a) arranged for Darian to make up the missed October 25 and 27 clinical time;

(b) allowed Darian to review charts and not see patients on November 1, 1994;

(c) permitted Darian to take patient records home and conduct utilization re-

---

22. With the exception of the Arlington & Malden Councils on Aging (which had one opening), all the other clinical sites already had ten nursing students and thus were not an alternative. The Board of Nursing does not permit more than a 1–10 teacher/student ratio at any clinical site. *See* 244 C.M.R. § 6.05(g) (specifying that "[a] teacher/student ratio in clinical practice in a structured setting shall not exceed 1:10.")

views there with her feet up on November 3, 1994;

(d) assigned Darian to the home health aid department and received no patient assignments on November 8, 1994;

(e) followed Darian's doctor's November 14, 1994, orders that Darian "see one patient per clinical day ... and not climb steps";

(f) continued to meet with Darian and her husband through the end of the semester to attempt to establish reasonable accommodations;

(g) offered an incomplete in the clinical portion of Nursing 410 and a chance to graduate in June 1995; and,

(h) granted Darian permission to take Nursing 410 again and to complete her requirements for a nursing degree, an opportunity not given to all students.

These accommodations may not have provided Darian everything that she wanted, but they were more than enough to satisfy the University's statutory duty of reasonableness. *See, e.g., Schmidt,* 89 F.3d at 344.

Overall, the University, after undertaking a diligent assessment of the available options, made a "professional, academic judgment that [a] reasonable accommodation [was] simply not available." *Wynne II,* 976 F.2d at 795. Therefore, the University decided that no further accommodations could be made for Darian without imposing hardship on the academic program.

Given the other circumstances in this case, a reasonable factfinder could not conclude that the University, having offered an array of remedial measures, failed to make a reasonable accommodation merely because it did not offer Darian what she wanted.

### C. *Title IX Claim*

Title IX prohibits educational institutions to discriminate based on sex. An educational institution is defined as "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department." 20 U.S.C. § 1681(c). The University is an educational institution within the meaning of Title IX.

Title IX provides that "[N]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic.. program or activity ..." 20 U.S.C. § 1681; 34 C.F.R. 106.31. Likewise, "[a] recipient [of federal funds] shall not discriminate against any student or exclude any student from its education program or activity including any class or extracurricular activity on the basis of such student's pregnancy ..." 34 C.F.R. 106.40(b)(1).

To prove a violation of Title IX, a plaintiff must establish a *prima facie* case by showing a preponderance of the evidence that: (1) she was a member of a protected class; (2) she was performing the academic requirements at a level well enough to meet her educator's legitimate expectations; (3) she suffered adverse treatment; and, (4) the educational program continued to instruct and credit other students. *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 897 (1st Cir.1988) (holding claims under Title IX will be analyzed using the Title VII burden shifting analysis in the employment context). Once a *prima facie* case is established, the burden shifts to the defendant, who must then articulate a legitimate non-discriminatory reason for excluding the plaintiff. *Id.* If the defendant is able to articulate such a reason, the plaintiff must demonstrate that the proffered reason is pretext. *Id.*

Even assuming a *prima facie* case, Darian cannot show that she met the legitimate educational expectations of both her clinical and classroom instructors.[23] She protests, citing her service as the class secre-

---

**23.** It is not even clear that the University excluded Darian from one of its programs. She left the program because she was upset and on the advice of her psychiatrist—not because the University forced her to leave. *See Dubois v. Alderson-Broaddus College, Inc.,* 950 F.Supp. 754, 760 (N.D.W.Va.1997) (holding that plaintiff who withdrew from a class to avoid a failing mark did not prove that the defendant caused his removal from its physician assistant's program).

tary, her 3.65 grade point average, her membership in the Golden Key Honor Society, and her grade of an "A" on her mid-term. This list of accomplishments misses the point. The crucial requirement for Nursing 410 was to provide care to patients and fulfill clinical objectives. After October 24, 1994, only the middle of the semester, Darian did not fulfill this requirement; she either did not attend clinical instruction or did not see patients. In addition, she did not complete the required final paper, did not take the final exam, and did not participate in a group project.[24]

Nursing 410's instructors have legitimate educational reasons for expecting all students, male and female, to complete all course requirements, clinical and classroom. These requirements insure that students will be able to provide quality nursing care to those in need. "This type of purpose, far from reflecting any animus against handicapped individuals, is shared by many if not most of the institutions that train persons to render professional service." *Southeastern Community College v. Davis*, 442 U.S. 397, 413, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979). Darian failed to meet the legitimate educational expectations of both her clinical and classroom instructors.

Darian's allegations of pretext are insufficient. When pretext is an issue in a discrimination case, the plaintiff must produce specific facts which, reasonably viewed, tend logically to undercut the defendant's position. *Villanueva v. Wellesley College*, 930 F.2d 124, 127 (1st Cir.), *cert. denied*, 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). The plaintiff cannot rest upon conclusory allegations, improbable inferences, and unsupported speculation. *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).[25] She has failed to meet her burden of proof on this issue.

## V. CONCLUSION

Darian left Nursing 410 on November 15, 1994, and did not attend class or clinical instruction again; she did not see patients any time after October 24, 1994; she did not complete her final paper, take the final exam or participate in the group project. She withdrew from the class after an unpleasant exchange with an instructor. Darian failed to meet the legitimate educational expectations of her instructors. The University provided her with reasonable options and she refused them. For the above stated reasons,

---

**24.** It is unclear how Darian's pregnancy interfered with the completion of these required assignments.

**25.** Darian has failed to produce sufficient evidence that the University's proffered reason is simply pretext. She cites remarks made by Prof. Dumas, Dr. Winfrey, and specifically, Prof. O'Malley as evidence of the University's intent to discriminate against her on the basis of her sex.

On November 8, Prof. O'Malley expressed to Darian her opinion that it was "unsafe" for Darian to return to clinical instruction due to her pregnancy. And on November 15, Prof. O'Malley, meeting privately with Darian in the NVNA conference room, called Darian a "backstabber." She also criticized Darian, saying she did not want to take an incomplete and finish the clinical class the following semester because Darian simply did not want to find a babysitter. While these are comments about Darian's pregnancy, they do not connote discrimination on that basis, or on the basis of gender.

In addition, Darian points to the comments attributed to Dr. Winfrey during the November 10 meeting which Dr. Winfrey met with the Darians. The Darians had asked Dr. Winfrey what Prof. O'Malley meant by it being "unsafe"

for Darian to return to clinical instruction. Darian claims that Dr. Winfrey's response was "if something happened, who would you hold liable?" In fact, during this conversation, there were threats of possible lawsuits and claims of discrimination. Once again, I fail to see the connection between this comment and discriminatory intent.

Finally, the November 26, 1994, letter which Prof. Dumas wrote to Darian in which she states, "Ms. Margaret Doherty, the executive director of Norwell Visiting Nurse Association has requested that you not work on site until after your pregnancy. She has serious concerns about your health and about the liability of the agency should you jeopardize your health and your pregnancy in the course of your clinical activity." Doherty denies making these comments and that these statements had been falsely attributed to her. Dumas did not recall ever talking with Doherty about these matters and stated that she "inferred" the statements attributed to Doherty through conversations with Prof. O'Malley.

Though these comments appear to be precipitous, they do not prove that the University's actions were pretext for discrimination on the basis of sex.

the University's motion for summary judgment is **ALLOWED.**

**SO ORDERED**